367 F.2d 528
 Alonzo PETTEYS and C. Frank Reavis, Appellants,
v.
Eunice S. BUTLER and Northwest Airlines, Inc., Appellees.
Alonzo PETTEYS and C. Frank Reavis, Appellants,
v.
Isadore BLAU and Northwest Airlines, Inc., Appellees.
 No. 18277.
 No. 18278.
 United States Court of Appeals Eighth Circuit.
 October 19, 1966.
 Rehearing Denied December 6, 1966.
 Certiorari Denied January 9, 1967.
 
 See 87 S.Ct. 712.
 Robert H. McRoberts of Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for appellants. Gaylord C. Burke and Edwin S. Taylor, St. Louis, Mo., and Richard W. Johnson of Neville, Johnson & Thompson, Minneapolis, Minn., and Martin D. Jacobs, William R. Luney and Gerald A. Eppner, of Reavis & McGrath, New York City, with him on the brief.
 J. L. Hannaford, of Doherty, Rumble & Butler, St. Paul, Minn., for appellee Eunice S. Butler. J. C. Foote and Frank Claybourne, St. Paul, Minn., with him on the brief.
 Morris J. Levy, New York City, for appellee Isadore Blau. Felix M. Phillips, of Shanedling, Phillips, Gross & Aaron, Minneapolis, Minn., with him on the brief.
 Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, and Jacob H. Stillman, Atty., S.E.C., Washington, D. C., on brief for the Securities and Exchange Commission.
 Before VAN OOSTERHOUT, BLACKMUN and GIBSON, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This appeal presents another difficult question on the applicability of the sanctions of § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b)[1] to a conversion of preferred stock into common stock, which was then sold within six months of the conversion. Appellants, Petteys and Reavis, appeal from a judgment of the United States District Court for the District of Minnesota holding them liable for profits realized from the sale of Northwest Airlines, Inc. common stock in a transaction held to be a short-swing speculation proscribed by § 16(b). The cases were joined for trial and one opinion written by the District Court. Jurisdiction of the cases filed is founded upon § 27 of the Act, 15 U.S.C. § 78aa, and upon 28 U.S.C. § 1331.
 
 
 2
 The facts of these cases are not in dispute. Petteys and Reavis are minority stockholders and were during the period in question, two of the thirteen directors of Northwest Airlines, Inc. (Company). On January 14, 1963, Petteys owned 5000 shares of the Company's 5¼% convertible cumulative preferred stock and 15,000 shares of common stock. Reavis owned 1167 shares of the preferred stock and 4000 shares of the common stock. Each had owned his stock for more than six months. On January 14, 1963, the Company had outstanding 449,615 shares of preferred stock and 1,388,459 shares of common stock. The common and preferred stock were listed and traded on the New York Stock Exchange; and the preferred stock was protected against dilution resulting from the issuance of additional common stock. The preferred and common stock each had one vote per share. Petteys had been a director since 1945 and Reavis since 1952. The preferred stock was convertible at any time on the basis of $25 for each preferred share into common stock at a conversion price of $26 for each common share plus accrued dividends prior to January 1, 1964.
 
 
 3
 At a meeting of the Company's board of directors on January 14, 1963, it was unanimously decided that the elimination of the preferred stock was desirable since this would place the Company in a more advantageous position to seek new capital. It was, therefore, unanimously decided to call for redemption of the preferred shares at $26.161815 per share on the entire outstanding issue ($26 redemption price plus accrued dividend). Both Petteys and Reavis were present at the directors' meeting. The market value of the preferred stock on this date was $34 per share, or about $8 more per share than the redemption price. The common stock of the Company at that time was selling for about $36 per share, which was approximately equal to the conversion rate of .9615 of common per share of preferred. Due to this wide difference between the market value of the stock and the redemption price, it was believed that the preferred shareholders would exercise their rights to convert their preferred shares into common prior to the redemption date of February 14, 1963. This judgment proved to be correct in that 99.98% of all the preferred shares were converted. Only 70 shares were not converted.
 
 
 4
 On January 17, 1963, when its market price was approximately $35 per share, Petteys converted his 5,000 shares of preferred stock for 4,808 shares of common stock. Less than six months after the conversion (between May 20 and June 18, 1963) Petteys sold 9,808 shares of common stock at prices ranging from 51 to 55½ per share.
 
 
 5
 Reavis converted his 1,167 shares of preferred stock on January 31, 1963, when the market value was approximately $38 per share and received therefor 1,123 shares of common stock. Less than six months later (June 5, 1963) Reavis sold 1,600 shares of common stock at prices ranging from 53¼ to 53 5/8 per share.
 
 
 6
 On February 25, 1963, eleven days after the terminal date of the redemption call, the board of directors increased the quarterly dividend on its common stock from 20 cents to 25 cents per share. After the increased dividend, the market price of the common stock increased substantially.
 
 
 7
 The Minnesota suit, Number 18277, was filed July 2, 1964, in the District Court by Petteys and Reavis, seeking a judgment against the Company to the effect that these transactions were not proscribed short-term profits making them accountable therefor to the Company under § 16(a) and (b) of the Securities Exchange Act. On July 8, 1964, Eunice S. Butler, a stockholder, was granted leave to intervene to seek judgment on behalf of the Company. On July 14, 1964, the Company filed an answer, stating, "It is and has been unwilling to institute or prosecute an action against the plaintiffs." On July 17, 1964, Isadore Blau, another stockholder, instituted an action in the United States District Court for the Southern District of New York against Petteys, Reavis and the Company, alleging a § 16(b) liability of Petteys and Reavis to the Company. The New York case was then transferred to the District of Minnesota. Both cases were combined for a hearing on cross-motions for summary judgment. Summary judgment was appropriate as the facts were not in dispute.
 
 
 8
 The District Court denied Petteys' and Reavis' motions, granted the motions of intervener Butler and plaintiff Blau, and held, in an opinion reported at 246 F. Supp. 526 (D.Minn.1965), that the conversion of the preferred stock into common stock constituted a "purchase" within the meaning of § 16(b), and therefore Petteys and Reavis were liable to the Company for profits derived from the sale of the common stock within six months after the date of "purchase" or conversion.
 
 
 9
 Petteys and Reavis contend that the conversion of preferred stock into common stock under the particular facts of this case was not a "purchase" within the meaning of § 16(b).
 
 
 10
 Petteys and Reavis, as directors, are "insiders"[2] under § 16(a) and subject to the requirements of § 16(a) and the civil liabilities of § 16(b). The only question remaining is whether their conversion of preferred stock into common stock constituted a purchase of the common so that the subsequent sale of common within six months thereafter would make them liable to the Company for any profit realized on the sale transactions. The fact that Petteys and Reavis had other common stock, purchased prior to the periods in question, from which their sales were, or could have been, made is immaterial.[3]
 
 
 11
 The reasons for the enactment of the Securities Exchange Act of 1934 and the specific purpose to be served by § 16(b) are fully documented and examined in prior § 16(b) cases discussed in this opinion, and will not be repeated in detail here. In summary, congressional investigations in the early 1930s disclosed a number of instances in which "insiders" of corporations had abused their fiduciary positions by using confidential corporate information to aid their personal market activities. Armed with information not available to ordinary stockholders, these "insiders" brought about artificial, but predictable, fluctuations in the market and, in so doing, were able to reap substantial profit with little or no investment risks to themselves — all at the expense of outside stockholders and the public. This manipulation and "sure thing" speculation discouraged valid investment and contributed to the cause and depth of the economic collapse of 1929. Congress, therefore, set out to remedy this particular evil with § 16 of the Securities Exchange Act of 1934.[4]
 
 
 12
 Section 16(b) of the Act was enacted expressly "[f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer * *." To implement this statement of purpose, the statute provides that profits realized by "insiders" from the purchase and sale, or sale and purchase, of equity securities of a company within a period of less than six months inure to the benefit of the company. This liability is enforceable by the company, or if the company fails to act, by a stockholder acting in a derivative capacity. The Act broadly defines "purchase" as "any contract to buy, purchase, or otherwise acquire," and "sale" as "any contract to sell or otherwise dispose of." 15 U.S.C. § 78c (a) (13) (14).
 
 
 13
 The section establishes liability "irrespective of any intention on the part of (the insider)." Though perhaps reaching harsh results in individual cases, this arbitrary rule is thought necessary for the attainment of the goal set forth in the statute. If it were otherwise, "insiders" could continue all but the most blatant of practices and take refuge behind an artificial wall of good faith. Experience with the common law remedy had convinced Congress that actual proof of bad faith was a most difficult burden and thus discarded any subjective approach based on intent and established an objective sanction against so-called short-swing profits irrespective of intent. This sanction does not prohibit short-swing sales; it only takes away their profit from such transactions and places it in the corporation. Thus, the motivation for market manipulation is considerably depressed.
 
 
 14
 The courts have recognized the broad remedial purposes behind this section and when a transaction is capable of insider abuse they have liberally construed the rule and applied it without hesitation and without regard to good faith. See, Smolowe v. Delendo Corporation, 136 F.2d 231 (2 Cir. 1943), cert. denied 320 U.S. 751, 64 S.Ct. 56; Blau v. Lehman, 286 F.2d 786 (2 Cir. 1960), aff'd 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403; Booth v. Varian Associates, 334 F.2d 1 (1 Cir. 1964), cert. denied 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556.
 
 
 15
 There is, however, a very different and difficult problem when a transaction falls within the literal boundaries of the Act, by giving a broad interpretation of the definitions of purchase as "any contract to buy, purchase or otherwise acquire," and sale as "any contract to sell or otherwise dispose of," yet due to the particular factual situation which makes unfair speculation impossible it is clearly beyond the Act's preventive purposes. In that situation the question arises, should the Act be literally applied without further inquiry and without regard to the purposes, or should the broad and arbitrary rules be applied only to situations which are capable of the abuse that the statute was designed to prevent? We believe that each case must be examined on its own facts and the Act only applied when these facts disclose the possibility of abuses that the Act were designed to prevent.
 
 
 16
 The first case dealing with the conversion of stock and the applicability of the "purchase" and "sale" provisions to a conversion, was Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2 Cir. 1947), cert. denied 332 U.S. 761, 68 S.Ct. 64, 92 L. Ed. 347. In this case the "insiders" were in complete control of the corporation. At a time when the value of the corporation's preferred shares was above the call price, the "insiders" exercised their corporate control by having the corporation call the outstanding preferred on a given future date. They, of course, converted their preferred into common and within six months of the conversion sold the common at a substantial profit. The court held that the conversion was a "purchase" within the definition set out in the statute and a sale within six months made them liable to the corporation for the profit. On the facts of this case, the holding was undoubtedly correct. The preferred stock was not readily marketable and was not protected from dilution. Thus, it maintained a value independent of the common. As the "insiders" were able to set a call date at their will, they were in a position to use inside information to determine this call date and to manipulate the independent values of the two securities to their profit. The court, however, in reaching its correct decision on the facts, used language unnecessarily broad. Loss, Securities Regulation, Vol. II, Ch. 6C(g), at page 1067 (2d ed. 1961). This language has since been interpreted as meaning that § 16(b) must be applied to all stock conversions and the strict terms of the statute are to be applied without regard to the purposes of the Act. See, Heli-Coil Corp. v. Webster, 352 F.2d 156 (3 Cir. 1965).
 
 
 17
 Though understandable, this was probably an incorrect interpretation to place on Park & Tilford, in that the Second Circuit, which has more § 16(b) cases than any other circuit, has since refused to follow the broad implications of that case. Since Park & Tilford, the Second Circuit has examined each case on an ad hoc basis to determine whether the transaction came within the purpose of the Act. It specifically refused to be bound by a "black-letter rubric" or a "rule of thumb" as Park & Tilford supposedly demanded.
 
 
 18
 In Shaw v. Dreyfus, 172 F.2d 140 (2 Cir. 1949), cert. denied 337 U.S. 907, 69 S.Ct. 1048, 93 L.Ed. 1719, the Court refused to hold that the receiving of a stock purchase warrant which was awarded equally to all shareholders was a "purchase" within the definition of the Act. The Court based its decision on the fact that, "`[i]nside' information which the directors may have cannot possibly be used to the detriment of other stockholders * * *. Nor will the purposes of the statute be defeated * *."
 
 
 19
 Roberts v. Eaton, 212 F.2d 82 (2 Cir. 1954), cert. denied 348 U.S. 827, 75 S.Ct. 44, 99 L.Ed. 652, held that a reclassification of stock was not a "purchase" of the new stock. Judge Clark, the author of the Park & Tilford decision, stated at page 86, "The reclassification at bar could not possibly lend itself to the speculation encompassed by § 16(b). This being so, it was not a `purchase' * *."
 
 
 20
 Even though the Court, in Blau v. Lehman, supra, held that a transfer came under the provisions of § 16(b), the Court stated at page 792 of 286 F.2d that a "[T]ransaction is a `purchase' if in any way it lends itself to the accomplishment of what the statute was designed to prevent."
 
 
 21
 Though establishing a general approach contrary to the implications in Park & Tilford, these three cited cases did not involve the precise question of the treatment of conversions. Park & Tilford was still cited for the proposition that conversions must flatly be considered "purchases", without further inquiry. This was true, however, only until the recent Second Circuit case of Blau v. Lamb, 363 F.2d 507 (2 Cir. 1966). The Court there was presented with a problem of whether the conversion of preferred stock into common stock constituted a "sale" of the preferred. In determining the correct approach for resolving this issue, Judge Waterman, for the Court, stated:
 
 
 22
 "Aside from the intimations to the contrary in Park & Tilford, our court appears always to have recognized that in deciding whether a certain transaction is a Section 16(b) `purchase' or `sale' it is relevant to first consider whether the transaction in any way makes possible the unfair insider trading that Section 16(b) was designed to prevent. * * * [T]he application of Section 16(b) depends upon whether the transaction in question could tend to accomplish what the section was designed to prevent."
 
 
 23
 In looking at the particular circumstances of the conversion, the Court concluded:
 
 
 24
 "(The) conversion afforded the insiders no opportunity to realize a gain by speculative trading in Air-Way Preferred. For this reason, we hold that the conversion was not a Section 16(b) sale of the Preferred."
 
 
 25
 With this case the Second Circuit limited Park & Tilford to its facts and completely destroyed any force found in the particular language of that decision intimating that a completely objective "rule of thumb" had to be applied in all conversion cases. The Lamb opinion relied heavily upon Ferraiolo v. Newman, 259 F.2d 342 (6 Cir. 1958), cert. denied 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629, and Blau v. Max Factor & Company, 342 F.2d 304 (9 Cir. 1965), cert. denied 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150. Judge Waterman, after reviewing the decisions, concluded that:
 
 
 26
 "The decided cases in this and other circuits do not require us to hold that, without further analysis, the conversion * * * must be regarded as a Sec. 16(b) `sale'. * * * Instead, most of the appellate decisions, including the more recent decisions of our court, state that the application of Section 16(b) depends upon whether the transaction in question could tend to accomplish what the section was designed to prevent."
 
 
 27
 Also, see Judge Van Oosterhout's dissent in part in Western Auto Supply Company v. Gamble-Skogmo, Inc., 8 Cir., 348 F.2d 736, at 745.
 
 
 28
 The facts in the Ferraiolo case are almost exactly in point with the facts of the case at bar. A non-controlling director held convertible preferred stock. While the market was high the corporation called for a redemption at a price below the market. The director, of course, converted his preferred into common and, as here, sold the common within six months of the conversion. The Court stated, at page 345, of 259 F.2d, "Every transaction which can reasonably be defined as a purchase will be so defined, if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16(b)." In examining the conversion on its particular facts, the Court concluded, at p. 346 of 259 F.2d, that it was not a purchase because, "Newman's conversion of Ashland preferred to Ashland common had none of the economic indicia of a purchase; it created no opportunity for profit which had not existed since 1948. The transaction [is] not one that could have lent itself to the practices which Section 16(b) was enacted to prevent."
 
 
 29
 Blau v. Max Factor, supra, concerned a situation where the insider held common stock which was in every way identical to Class A stock except the board of directors had the authority to declare less dividend on the common. Each had the same market value, same voting power and was fully convertible. The insider converted his common for Class A and sold the Class A within six months. The Court held, at pages 307-308 of 342 F.2d:
 
 
 30
 "(A) Transaction is held to be a `purchase' within section 16(b) `if in any way it lends itself to the accomplishment of what the statute is designed to prevent.' * * *
 
 
 31
 "The exchange of Class A for Common did not interrupt the continuity of appellees' investment: it did not increase or decrease the amount invested, or alter in any way the risk assumed * * *. (T)he exchange conferred no opportunity for speculative profit which appellees did not already enjoy."
 
 
 32
 These two cases refused to apply a "rule of thumb," examined the facts of the case in the light of the purposes of the statute, and in each case concluded that the particular conversion did not constitute a "purchase" because there was no opportunity for speculative profit.
 
 
 33
 There is no doubt that the majority in Heli-Coil Corp. v. Webster, supra, takes an approach and reaches a result inconsistent with the aforementioned cases. Heli-Coil expressly holds: "We conclude that § 16(b) does set up a `rule of thumb' and was intended by Congress to do precisely that." p. 166 of 352 F.2d; but that is, however, at present a minority ruling and is founded almost solely upon the rationale of Park & Tilford. Since Park & Tilford has now been severely limited by the later Second Circuit decisions on this issue, we cannot refrain from the belief that Heli-Coil is likewise weakened.
 
 
 34
 Our decision in Western Auto Supply Company v. Gamble-Skogmo, Inc., 348 F.2d 736 (8 Cir. 1965), cert. denied 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475, was interpreted by the S.E.C. as indicating that we had adopted the so-called Park & Tilford objective approach to § 16(b) problems. Obviously, the facts of the two cases are not analogous. Even so, we find no dictum inconsistent with our holding herein. We held that the statute must be "liberally construed to carry out the express legislative policy" and that the good faith of the insider is no defense. This is a correct statement of the law that we will continue to follow. We certainly did not hold in Gamble-Skogmo that the statute must be literally applied even when the "express legislative policy" was not applicable to the factual situation under consideration.
 
 
 35
 Therefore, notwithstanding the broad language in the Park & Tilford case and the ruling in Heli-Coil Corp. v. Webster, we believe the rule has been clearly established by a majority of the circuits, that each case must be examined on its own particular facts. If, from an examination of the particular facts, a transaction is of a kind that can possibly lend itself to the speculation encompassed by § 16(b) and falls within the broad definitions of "purchase" and "sale", it will be so defined. However, if an examination of the facts indicates that there is no possibility of abuse, there is no need to apply a § 16(b) label to the transaction. See, Comment, 59 Yale L.J. 510 (1950); Loss, Securities Regulation, Vol. II, Ch. 6C(g), at pages 1069-1070 (2d ed. 1961); Comment, 45 Va.L.Rev. 124, 126 (1959).
 
 
 36
 A facet to consider as militating against painting every conceivable conversion with the same broad brush, regardless of the lack of opportunity for short-swing market manipulation, is the manifestly absurd and unfair result that can flow from such a per se black-letter rubric. As noted by Loss, supra, at 1068:
 
 
 37
 "As a matter of fact, if every conversion involved both a `purchase' of common and a `sale' of preferred, no director or officer or 10 per cent beneficial owner could ever buy preferred or sell common in the market without the risk that a forced conversion within the next six months would subject him to liability."
 
 
 38
 The conversion transactions have been variously referred to as "statutory purchases," Blau v. Max Factor, supra, and "unorthodox `purchase and sale' cases." See Loss, supra. They are not true sales but represent a type of exchange of equivalents that can be read into a literal interpretation of the § 16(b) language of "otherwise acquire" and "otherwise dispose of."
 
 
 39
 Undoubtedly, Congress realized that with such all-inclusive definitions there would be situations in which the definitions would be applicable yet the transactions would be of a nature that was not comprehended as being within the purposes of the Act. Congress specifically gave authority to make this determination to the Securities and Exchange Commission so that an administrative interpretation could facilitate enforcement of the Act and yet prevent undue hardship on those caught in the web of a categorically broad proscription. We have not been convinced that this authority is the exclusive prerogative of the S.E.C. and is not also subject to adjudication by the courts. Courts have always been, and should be, reluctant to impose broad statutory rules that result in purposeless and unnecessary harshness. When the reason of the law ceases, the law itself ceases (to operate), is a well-known and time-proved rule of construction that is appropriate in this case. Cessante ratione legis, cessat et ipsa lex. See Blau v. Lamb, supra. Since the purposes of the Act are stated clearly and appear side-by-side with the literal demands, we do not believe we have been precluded by Congress from pursuing an equitable and historic role by examining the facts of each case in the light of the stated goals to determine on an ad hoc basis whether the purposes of the Act are in any way being served by an application of the literal provisions. If no purpose is served by attaching the artificial label of "purchase" to a transaction when it has none of the common indicia of a purchase, no such label is demanded, nor will one be attached. This, we believe to be the correct law and it is the law to be applied by us to the facts of this case.
 
 
 40
 As a general proposition, conversions of equity securities are not transactions which normally lend themselves to short-swing speculation. 59 Yale L.J. 510 (1950). This is not to say that the vehicle of conversion may not, under any circumstances, be used for the purposes of unfair speculation. We can envision in the abstract a combination of facts and events in which insiders might gain an unfair advantage by the exercise of their conversion rights, and no doubt clever individuals conversant with the subject can envision many. However, so unlikely is abuse of the contractual conversion privilege that the S.E.C., with its considerable expertise and years of experience in dealing with these matters, has concluded that the conversion of equity securities is not even comprehended within the purposes of § 16(b) of the Act. Pursuant to its statutory authority, on February 17, 1966 the S.E.C. amended Rule 16b-9, 17 C.F.R. § 240.16b-9 to read, in its pertinent part, as follows:
 
 
 41
 "Exemption from Section 16(b) of Transactions involving the Conversion of Equity Securities.
 
 
 42
 (a) Any acquisition or disposition of an equity security involved in the conversion of an equity security which, by its terms or pursuant to the terms of the corporate charter or other governing instruments, is convertible immediately or after a stated period of time into another equity security of the same issuer, shall be exempt from the operation of Section 16(b) of the Act;"
 
 
 43
 In its amicus brief to this Court, the S.E.C. has argued that this rule must be applied prospectively only and that since the conversion, as well as the trial, preceded the enactment of the rule it should not be applied as a matter of law to the case now before us. Given the law set forth herein, whether this exemption should be applied retroactively to conversions capable of abuse, we need not decide. From an examination of the facts before us, the unique facts of this particular case, we are convinced that no unfair speculation was possible. The necessarily rare combination of many factual elements which would make short-swing speculation possible are not present herein. The conversion of the securities thus did not constitute a "purchase" within the meaning of the statute, and appellants, Petteys and Reavis, consequently are not liable for any profit received by a subsequent sale. The retroactivity of this new rule is thereby rendered a moot question.
 
 
 44
 The preferred stock held by the two directors was fully marketable and listed on the New York Exchange. It was protected against dilution, had equal voting power, was fully convertible and at all times maintained a market value equivalent to the common. The conversion did not increase or decrease the amount invested, change the proportion of ownership, affect voting rights, or substantially alter the risk assumed. Blau v. Max Factor, supra. Thus, it appears to us that the common and preferred are truly "economic equivalents" in which speculation from their conversion would be virtually impossible. Ferraiolo v. Newman, supra; Roberts v. Eaton, supra.
 
 
 45
 In facing a call of the preferred, if the directors wanted to maintain their investment, which they had every right to do, the only course open to them was a conversion. Unlike Park & Tilford, where the controlling directors unilaterally decided to call the preferred and themselves established the call date, the directors herein were not in control of the corporation. The call date was set and, to maintain their long-term investment in the corporation, they had no choice but to convert. This conversion being "forced" upon them, it is not a type of situation that one can normally expect to use for a profitable speculation. Ferraiolo v. Newman, supra.
 
 
 46
 In the case before us, the stockholders were adequately informed of the proposed call. Substantially all of the shareholders responded to the economic demands of the call, and, like Petteys and Reavis, converted their preferred for common rather than suffer a needless and substantial economic loss. With nearly all of the outstanding preferred shares being converted (99.98%), we cannot envision how directors Petteys and Reavis, by their conversion, could gain an unfair advantage over the other shareholders. In reality, all were treated alike and thus none was vulnerable to unfair advantage due to access to inside information. Even the assumed inside knowledge of the future dividend increase, in this case, did not open up possibilities of abuse, as all preferred shareholders converted for common and thus received the increased dividends and the benefit of consequent market rise (the 70 shares not converted are treated as de minimis). Since all shareholders remained in an equal position, none was, or could have been, taken advantage of by the conversion of an insider. Shaw v. Dreyfus, supra.
 
 
 47
 It is, therefore, our conclusion that this particular transaction under the facts and circumstances of this case could not possibly have lent itself to the speculation encompassed within the purposes of § 16(b) of the Act. This being so, the conversion should not be considered as a "purchase" within the purview of the Act's provisions. Our position on this conclusion is supported, we believe, by the like conclusion in Ferraiolo v. Newman, the analogous cases of Blau v. Lamb, and Blau v. Max Factor, and by the rationale of the recent ruling of the S.E.C. amended Rule 16b-9, acknowledging that conversions are not the type of "transactions" that are "comprehended within the purposes of Section 16(b)."
 
 
 48
 While our decision is not based on the S.E.C. amended Rule 16b-9 dealing with conversions, the rule is noted as a recognition of the rationale that ordinarily conversions are not purchases or sales. The contract rights of conversions are secured at time of purchase of the convertible security. And, as aptly reasoned in Blau v. Lamb, at 525 of 363 F.2d:
 
 
 49
 "We think that in cases like the present involving the purchase of a convertible security and its subsequent conversion, the issue should be whether the underlying security has been sold within six months from the acquisition of the convertible security." (Noting the dissent in part of Judges Hastie and Kalodner in Heli-Coil).
 
 
 50
 A like application would place the transactions at bar beyond not only the purposes of the Act but also the broad terms thereof.
 
 
 51
 Accordingly, judgment is reversed with instructions to grant judgment in favor of appellants.
 
 
 
 Notes:
 
 
 [1]
 § 16(b) Securities Exchange Act of 1934, 15 U.S.C. § 78p(b):
 "For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer * * *. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer * * *. This subsection shall not be construed to cover any transaction * * * which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."
 
 
 [2]
 "Insiders" as denoted in cases and articles dealing with § 16(b) are those who are required to report under § 16(a) any sale or purchase of stock, and who are subject to the sanctions of § 16(b). They are: "16(a) Every person who is directly or indirectly the beneficial owner of more than 10 percentum of any class of equity security * * * or who is a director or officer of the issuer of such security, * * *."
 
 
 [3]
 Although it is not clear whether the shares sold were the same certificates acquired in the conversion, this point is immaterial. Equity securities are treated as fungible items. "(S)ince all shares of a corporation's stock are alike and interchangeable, it is of no consequence whether those bought and sold are represented by the same certificates." Walet v. Jefferson Lake Sulphur Co., 202 F.2d 433, 434 (5 Cir. 1953), cert. denied 346 U.S. 820, 74 S.Ct. 35, 98 L.Ed. 346; Smolowe v. Delendo Corporation, 136 F. 2d 231 (2 Cir. 1943), cert. denied 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446; Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736 (8 Cir. 1965), cert. denied 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475
 
 
 [4]
 For a more complete discussion of the background and purposes of the Act, see Smolowe v. Delendo Corporation, 136 F. 2d 231 (2 Cir. 1943); Blau v. Lamb, 363 F.2d 507 (2 Cir. June 27, 1966); Comment, 59 Yale L.J. 510 (1950); Comment, 45 Va.L.Rev. 949 (1959); Comment, 66 Harv.L.Rev. 385 (1953)
 
 
 BLACKMUN, Circuit Judge (dissenting):
 
 52
 Having been a member of the majority in Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736 (8 Cir. 1965), cert. denied 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475, I feel obliged respectfully to dissent. While that case and this one are factually different, I suspect that the results are philosophically inconsistent. I also wonder whether our decision in Gamble-Skogmo might not, in part at least, have prompted Judge Nordbye to decide oppositely in the two cases at the trial level.
 
 
 53
 The majority seem to concede that the conversion here "falls within the literal boundaries of the Act" and "can be read into a literal interpretation of the § 16(b) [§ 3(a) (13) and (14)] language of `otherwise acquire' and `otherwise dispose of'". Further, I bear in mind the inescapable facts here (a) that these plaintiff-directors voted for the call of the preferred; (b) that they voted for the increase in common dividend effective shortly thereafter; (c) that their increments of ownership in the corporation after the conversion were exactly the same as they would have been had they sold their preferred on the open market and forthwith used the proceeds of that sale to purchase common on the market; and (d) that in the latter situation, with the ensuing sale of common, no one would or could dispute the applicability of § 16(b) and the consequent liability of the plaintiffs. These facts, it seems to me, add up to the possibility of misuse of inside information. And this mere possibility suffices.
 
 
 54
 My own reaction is that either the statute means what it literally says or that it does not; that if the Congress intended to provide additional exceptions, it would have done so in clear language; and that the recognized purpose and aim of the statute are more consistently and protectively to be served if the statute is construed literally and objectively rather than non-literally and subjectively on a case-by-case application. The latter inevitably is a weakening process.
 
 
 55
 However, with the Second Circuit now clearly withdrawing from Judge Clark's broad measure of § 16(b) as expressed in Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2 Cir. 1947), cert. denied 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347, the Courts of Appeals, other than the Third Circuit's 6-2 en banc majority in Heli-Coil Corp. v. Webster, 352 F.2d 156 (3 Cir. 1965), appear now to prefer to follow the ad hoc path. The Supreme Court ultimately may say that that view is to be preferred. At least, Mr. Justice Stewart's attitude is apparent from his authorship of the opinion in Ferraiolo v. Newman, 259 F.2d 342 (6 Cir. 1958), cert. denied 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629. Until the Supreme Court does so state, however, I must, in good conscience, adhere to my literal and objective construction preference.
 
 
 56
 I confess that my persuasion has been deeply shaken by the Security and Exchange Commission's recent about-face with its amendment of its Rule 16b-9, 17 C.F.R. 240.166-9, and its announced position that from and after February 17, 1966, a conversion of this kind is outside the statute and not touched by it, but that these plaintiffs' particular conversions, effected prior to that date, are within the statute and subject to its consequences. I am not entirely sure that Congress, by the subsection's final sentence, meant to give the Commission the power so to legislate at will by abruptly changing the reach of the statute which it had regarded otherwise for over a generation, or that, if it did, such delegated authority is not vulnerable to attack, or that the announced new rule is consistent with the statute anyway. But these are issues which we need not now decide.
 
 
 57
 Perhaps the Supreme Court one day soon will tell us how these somewhat conflicting approaches to § 16(b) by the Courts of Appeals are to be resolved. In the meantime, I would affirm.