EMERSON ELECTRIC CO., a Missouri Corporation, Appellant,

v.

RELIANCE ELECTRIC COMPANY, an Ohio Corporation, Appellee.

No. 20014.

United States Court of Appeals, Eighth Circuit.

Nov. 12, 1970.

R. H. McRoberts, Thomas C. Walsh, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for appellant.

Thomas P. Mulligan, Patrick J. Amer, Jones, Day, Cockley & Reavis, Cleveland, Ohio, Kenneth S. Teasdale, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, Mo., for appellee.

Before GIBSON and LAY, Circuit Judges, and HUNTER, District Judge.

ELMO B. HUNTER, District Judge.

This is an interlocutory appeal from a declaratory judgment holding that Emerson Electric Company is liable to Reliance Electric Company under Section 16(b) of the Security Exchange Act of 1934 [1] for the net profits realized by Emerson from the sale on August 28, 1967, of 37,000 shares of the stock of Dodge Manufacturing Corporation and from the sale on September 13, 1967, of 115,282 shares of Dodge stock.[2] Only the issue concerning the amount of profits recoverable by Reliance has been reserved for future determination by the District Court.

The salient facts are relatively undisputed.[3] Toward the end of 1966, Emerson, a St. Louis based manufacturer of electric motors, became interested in Dodge of Mishawaka, Indiana, a company engaged in the manufacture of transmission equipment and other devices used with electric motors. Dodge was a publicly held corporation, and its stock was listed on the New York Stock Exchange. Emerson engaged in merger negotiations with Dodge. On March 12, 1967, Emerson was advised that Dodge's board had rejected Emerson's merger offer. On March 22, 1967, Emerson withdrew its merger proposal, terminated negotiations with Dodge, and so advised the financial community.

On May 22, 1967, Emerson invited tenders of up to 550,000 shares of Dodge's common stock at a price of $63 per share, the tender offer to expire

June 16, 1967. At that time Emerson elected to purchase all of the 152,282 tendered shares. These shares constituted 13.2 percent of the outstanding Dodge stock. Prior to June 16, 1967, Emerson had not owned any shares of Dodge stock.

Shortly before the Dodge stock acquisition by Emerson, Dodge and Reliance Electric & Engineering Company (now Reliance Electric Company) had entered into an agreeement whereby Dodge was to be merged into Reliance.[4] Emerson sought to prevent the merger, which needed stockholder approval, advocating instead a merger with Emerson.[5]

A stockholders' meeting to consider the merger proposal was called for August 22, 1967. A proxy fight ensued, the result of which was a victory for Reliance.[6] Shortly thereafter, but prior to the final approval of the Dodge-Reliance merger by the Dodge directors, Emerson sold its Dodge holdings. Emerson first sold 37,000 shares at $68 a share on August 28, 1967, to Goldman, Sachs & Company, investment brokers. This sale reduced Emerson's holdings to 9.96 percent of the then outstanding shares of Dodge. Then, on September 11, 1967, it sold the remaining 115,282 shares at $69 a share to Dodge.

The background of the two sales is that Emerson had been advised by its counsel by letter that Section 16(b) might apply if Emerson owned 10 percent or more of Reliance's stock at the time of a Reliance and Dodge merger;

1. 48 Stat. 896 (1934); 15 U.S.C. § 78p.

2. The District Court certified the case for interlocutory appeal under authority of 28 U.S.C. § 1292(b) with leave granted by this Court to take the interlocutory appeal.

3. The parties stipulated to most of the essential facts prior to the trial, and the District Court has set them out in its opinion reported at 306 F.Supp. 588.

4. The evidence indicates Dodge's management unexpectedly announced its intent to merge with Reliance.

5. On May 27, 1967, Dodge filed suit in federal court in South Bend to enjoin Emerson from accepting any tenders and from further pursuing its tender offer. The District Court denied the injunction, finding in its memorandum opinion that Emerson did not have any "insider" information about Dodge and that all its knowledge about Dodge had been obtained from publicly available sources.

6. Emerson made a counter-proposal in opposition to Reliance's merger offer and the Dodge board opposed it and refused to allow Emerson to examine the list of Dodge's shareholders. Emerson successfully filed suit to obtain the list.

counsel further advised that Emerson reduce its holdings below 10 percent, and they advised that from that point on, Emerson, no longer being a 10 percent stockholder of Dodge, could sell the balance of its Dodge stock free of any 16(b) risk, "provided, of course, the second sale is not legally tied in any way to the first sale." [7]

Emerson sold the mentioned 37,000 shares, reducing its holdings to 9.9 percent of Dodge stock. On August 29, 1967, counsel for Reliance initiated discussions with counsel for Emerson to purchase the remaining 115,282 shares of common stock of Dodge from Emerson. Prior to this time Emerson had not offered to sell the 115,282 shares of Dodge to Reliance.

Based essentially on these facts, the District Court found that Emerson's two sales transactions were related parts of a single plan devised by Emerson to dispose of all of its Dodge stock in an attempt to avoid the consequences of Section 16(b), and held Reliance was entitled to the profits from both sales.[8] This appeal followed.

*Section 16(b) of the Securities Exchange Act*

Section 16(b) reads:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchas-

---

7. See, Lang & Katz, Liability for "Short Swing" Trading in Corporate Reorganizations, 20 Sw.L.J. 472, 486–87 (1966); Roger George, The Application of Section 16(b) to Mergers: A Hidden Hazard, 47 Tex.L.Rev. 1417 (1969).

The letter written ten days after Emerson had purchased its Dodge shares advised that in view of the uncertainty as to whether Emerson's purchases would be subject to Section 16(b) Emerson should seek to avoid 16(b) consequences by reducing its holdings to less than 10 percent by means of gift or sale prior to August 22, 1967, of 37,150 shares of Dodge stock; "[that] from this point on, Emerson, no longer being a 10 percent stock owner of Dodge, can sell the balance of its Dodge stock free of any 16(b) risk; provided, of course, the second sale is not legally tied in any way to the first sale." * * * "It may be possible at sometime before the Dodge-Reliance merger vote to agree upon a settlement with these companies under a negotiated agreement providing for the purchase of the Dodge shares owned by Emerson and/or the Reliance preferred shares to be received if the Dodge-Reliance merger is effected. It seems necessary however, that any such settlement provide for a sale by Emerson of at least 37,100 of its Dodge shares before the August 22, meeting date."

8. For the full reasoning of the District Court, see 306 F.Supp. 588, 591–593 (E.D.Mo.1969), wherein it is stated, loc. cit. 592: " * * * although the two sales of Dodge stock were technically separate transactions and the second sale was not 'legally' tied in any way to the first sale, the two sales were effected pursuant to a single pre-determined plan of disposition with the overall intent and purpose of avoiding Section 16(b) liability. Emerson's initial sale of 37,000 shares was motivated solely by its desire to reduce its holdings to just under 10% immediately prior to disposing of the balance of its shares in an attempt to escape Section 16(b) liability on the short-swing profits it contemplated would be made upon such remaining shares."

* * * * *

"Looking through form to discern substance, we hold that in truth and in fact the two sale transactions were related parts of a single plan devised by Emerson to dispose of all its Dodge stock in an attempt to 'avoid the consequences' of Section 16(b). * * * [W]e believe that for purposes of this case the 'time of sale' should include the entire period during which a series of related transactions take place pursuant to a plan by which a 10% beneficial owner disposes of his stock holdings."

ing the security sold for a period exceeding six months. * * * *This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." (Italics added.)*

Thus, under the provisions of Section 16(b) owners owning more than 10 percent or more of the security of a company *"both at the time of the purchase and sale, or the sale and purchase, of the security involved"* are accountable to the corporation for any profit realized on the security transactions made within a six month period.[9]

The initial question presented on this appeal is whether Emerson's purchase of 13.2 percent of the outstanding shares of Dodge's common stock, when prior to such purchase Emerson had not owned any Dodge securities, made Emerson at the time of that very purchase a more than 10 percentum beneficial owner within the meaning of Section 16(b).

It is Emerson's position that the exemption provision of Section 16(b) applicable to more than 10 percent beneficial owners specifically exempts any transaction where such beneficial owner

was not such *both at the time of purchase and sale,* and that "at the time of" means "prior to" the purchase in question. However, Reliance contends that "at the time of" means "simultaneously with" the purchase in question. Both parties cite an array of text and Law Review commentaries which reflect there exists no unanimity on the part of legal scholars on the question presented.[10]

There is reasonable unanimity as to the *broad* purpose sought to be served by the enactment of Section 16(b). In one of the Congressional Committee Reports on the pending legislative act concerning the subject of the evils of certain "short-swing trading" it was declared that a purpose of 16(b) was "to protect the interests of the public against the predatory operations of directors, officers, and principal stockholders of corporations by preventing them from speculating in the stock of the corporations to which they owed a fiduciary duty."[11] While not unanimous, the majority of the text and law review writers, as well as the majority of the case decisions, appear to concede that the 16(b) statutory language "both at the time of the purchase and sale" is not clear and has an element of ambiguity. As one writer expressed it, "at the time" is not a phrase of precise meaning. It may refer to a condition exist-

9. Section 16(a) reads: "Every person who is directly or indirectly the beneficial owner of *more than 10 per centum* of any class of any equity security (other than an exempted security) which is registered on a national securities exchange." (Italics added.)

10. For some examples, see: W. Painter, Federal Regulation of Insider Trading, Chpt. III, pp. 24–52 (1968); Note, Short-Swing Profits and the Ten Percent Rule, 9 Stan.L.Rev. 582 (1957); Note, Stockholder Acquiring 10% Ownership on Purchase Held Liable for Profits Under Section 16(b) of the Securities Exchange Act, 57 Colum.L.Rev. 287 (1957); Note, Director Held Liable Under Section 16 (b) for Short Swing Profits on Stock Purchased Prior to His Becoming a Director, 45 Va.L.Rev. 1057 (1959); Note,

Purchase of Stock By Which Stockholder Becomes a 10% Beneficial Owner is Covered by § 16(b), 70 Harv.L.Rev. 1312 (1957); Seligman, Problems Under the Securities Exchange Act, 21 Va.L.Rev. 1 (1934); Lowenfels, Section 16(b): A New Trend In Regulating Insider Trading, 54 Corn.L.Q. 45 (1968); Munter, Section 16(b) of The Securities Exchange Act of 1934; An Alternative to "Burning Down The Barn In Order to Kill the Rats", 52 Corn.L.Q. 69 (1966); Note, Insider Trading: The Issuer's Disposition of An Alleged 16(b) Violation, 1968 Duke L.Rev. 94; George, The Application of Section 16(b) To Mergers: A. Hidden Hazard, 47 Tex.L.Rev. 1417 (1969).

11. S.Rep.No.1455, 73d Cong., 2d Sess. 68 (1934). See also: 48 Stat. 881 (1934); 15 U.S.C. § 78a.

ing either "immediately before", "simultaneously with" or "immediately after" a given event. It is doubtful that Congress intended it to have one of those meanings in every situation. Therefore, without departing from the statute the words "at the time" might mean "immediately before" in the case of a purchase and "simultaneously with" in the case of a repurchase.[12]

## Prior Decisions

In spite of the intense interest in the question, there is a paucity of judicial decision on the precise question presented on this appeal. It was the case of Stella v. Graham-Paige Motors Corp., 232 F.2d 299 (2nd Cir. 1956), cert. den. 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956) affirming 104 F.Supp. 957 (S.D. N.Y.1952) that provided the notable decision in the still continuing battle concerning proper interpretation of the Section 16(b) words "at the time of". The Second Circuit, in a two-to-one opinion rejected the defendant's contention that the proviso required the exclusion of a person who was not a 10 percent owner before each of the transactions involved. Instead, the Court based its decision on the interpretation of the proviso adopted by the district court and supported by the SEC in an amicus brief, that a 10 percent stockholder need only be such simultaneously with each transaction; that is, just after a purchase or just before a sale.[13]

Courts having the occasion to interpret the Securities Act with regard to questions other than the precise one we have before us have generally held that the Act should be liberally construed to carry out the express legislative policy.[14]

While the problem of interpretation is difficult and not free of all doubt, we are persuaded that in the case before us the district Court reached the right result in its holding that the purchase by which one becomes a more than 10 percentum stockholder, where followed by a sale within six months of some or all of the purchased security makes the purchaser a more than 10 percentum beneficial owner within the meaning of Section 16(b) "both at the time of the purchase and sale." We endeavor to give our reasons for reaching this result.

We are persuaded that the Congressional intent, albeit broad and not as clear as desirable, was to authorize recovery of any realized profit by directors, officers and certain large stockholders who engaged in short-swing transactions (six months or less) of sale and purchase or purchase and sale. The intent as to such short-swing transactions was to stop the *possible*, not the actual—for that was considered to be too difficult to prove—use of inside information.[15] It is clear that Section 16(b) applies to every more than 10 percentum beneficial owner without regard

12. Note, Stockholder Acquiring 10% Ownership on Purchase Held Liable for Profits Under Section 16(b) of the Securities Exchange Act, 57 Colum.L.Rev. 287, 289 (1957).

13. To the contrary, see, Arkansas Louisiana Gas Co. v. W. R. Stephens Investment Co., 141 F.Supp. 841 (W.D.Ark. 1956).

14. See Creswell-Keith, Inc. v. Willingham, 264 F.2d 76, 80 (8th Cir. 1959). See, Western Auto Supply Co. v. Gamble-Skogmo, Inc., 348 F.2d 736, 743 (8th Cir. 1965), where we stated, "The Supreme Court in Blau v. Lehman, 368 U.S. 403, 414, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962), speaks of the 'prophylactic' effect Con-

gress clearly prescribed in § 16(b). Other cases cited in this opinion refer to § 16(b) as being 'remedial', 'broadly remedial', 'thorough-going', and 'absolute' in strictly construing the statute against the insider in order to effectuate its wholesome purpose."

15. Actual culpability is not required of the narrow class of persons to which Section 16(b) applies. As said by Judge Learned Hand in Gratz v. Claughton, 187 F.2d 46, 49–50 (2nd Cir. 1951), cert. den. 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353 (1951): "The section does indeed cover trading by those who in fact have no such information, * * *. If only those persons were liable, who could be proved

to his factual access to or possession of inside information. The statute speaks only of more than 10 percentum beneficial owners and not of "insiders". It does not require inside knowledge or bad motive. It is also sufficiently clear that Congress intended that Section 16(b) apply to only those or only to that class recognized by the 16(b) statutory language as generally having the opportunity of obtaining inside information, and that more than 10 percent security holders were deemed by Congress to be of that class.[16]

Thus, to carry out the general purpose Congress sought by enactment of the statute, having in mind that at least to some degree that language is not free of ambiguity, we have concluded that the purchase by which a security holder acquires a more than 10 percentum status is included as a part of a pair of transactions of purchase and sale occurring within six months of each other within the meaning of Section 16(b). Any other view has the weakness of impracticability of application of the statute, a result we should not lightly attribute to a Congress striving to prevent what it considered to be highly undesirable speculations by certain security owners who are in position to obtain or to be exposed to that kind of inside information

lending itself to speculative use to the possible detriment of the public.

Illustrative of some of the mischief that would be permitted in spite of Congress' action in enacting 16(b) if we accorded with Emerson's contentions is an initial purchase of as large a block of stock as 51 percent or more of a corporation's stock, followed by a sale any time within six months by the stockholder who obviously within that period could obtain much inside information and also could influence, manipulate or control corporate transactions. The deterrence of such apparent potential mischief must have been within the contemplation of Congress.[17]

Nor does the fact that Emerson acquired its stock in an effort to merge with Dodge and sold it after such merger appeared no longer possible exempt Emerson from the ambit of Section 16(b). An insider engaged in a contest for control of its stock issuer may have substantial opportunity for short-term profits perforce of its substantial stock ownership. In less than three months from its stock purchase Emerson apparently had made substantial short term profits related to its stock acquisition activities in its effort to gain stock control of Dodge.[18]

to have a bargaining advantage, the execution of the statute would be so encumbered as to defeat its whole purpose." See, also, Western Auto Supply Co. v. Gamble-Skogmo, Inc., supra, 348 F.2d at 743, "We cannot have one rule for insiders with good intentions and another for those who would flagrantly abuse their trust. The burden of the Act must fall on all violations with equal weight." Thus, Section 16(b) is viewed as not penal requiring intent to misuse inside information but simply remedial to remove the right to retain profits obtained while in the advantageous position the statute describes.

16. "The corporation is thus provided with a method of recoupment from insiders profits realized either through purchases of an equity security followed by its sale at a higher price, or from sale of an equity followed by a purchase at a lower

price within the six month period. Once the statutory conditions have been fulfilled, it is irrelevant that the insider either did not make unfair use of inside information or that he might not have intended, at the time he purchased the security, to sell it within six months." Painter, Federal Regulations of Inside Trading, Chpt. III, pp. 24–25 (1968).

17. One notorious example before Congress concerned brothers who within a short time before company passed a dividend sold their stock for $16,000,000 and after the dividend became public repurchased an equivalent amount for $7,000,000. See: S.Rep.No.792, 73rd Cong., 2nd Sess. 9 (1934).

18. See: Note, Insider Trading: The Issuer's Disposition of an Alleged 16(b) Violation, 1968 Duke L.J. 94, 97. "Section 16(b) often imposes liability on the

We reach the last question of the present appeal; namely, whether Emerson's sale of 115,282 shares of stock on September 13, 1967, within six months of its acquisition of 13.2 percent of Dodge's stock but at a time when Emerson had reduced its stock holdings to below 10 percent of Dodge's stock, is a transaction where the beneficial owner was a more than 10 percent beneficial owner both at the time of the purchase and sale within the intendment of Section 16(b). The District Court found that while Emerson was the beneficial owner of 13.2 percent of Dodge shares it determined to dispose of its entire stock holdings pursuant to a plan whereby it hoped to avoid, to the extent possible, Section 16(b) liability for short term profits. Pursuant to that determination it made the mentioned two separate sales not tied in any legal way to each other.

Insofar as we are advised the question presented by the second sale is one of first impression. Our review of the record indicates the District Court's finding as a fact that Emerson made two separate sales not legally tied together in any way, with the described intent to avoid losing its profit on its second sale because of possible Section 16(b) applicability, is not clearly erroneous, and is supported by substantial evidence. The factual question as to whether a particular sale is a separate and independent sale is a matter for de-

cision under the peculiar facts of the particular case. In this regard each case must stand or fall on its own facts.

■ However, there is no reason why a person may not conduct his business in such a way as to intentionally minimize or eliminate his loss of profits under Section 16(b) by any means permitted by law. Such conduct is to some extent analogous to tax avoidance conduct which is permissible.[19] We, therefore, do not fault Emerson for its effort to avoid the total loss of profits on its 152,282 shares of stock by first reducing its holdings by means of a bona fide sale to below 10 percent, and then in a later, independent bona fide sale while owning less than 10 percent, dispose of its remaining shares.

Concededly, Congress through Section 16(b) did not endeavor to deny profits resulting from all insider transactions. Stock held one day more than six months before being sold escaped Section 16(b) regulation entirely. Stock amounting to a bare fraction less than the "more than 10 percentum" likewise escaped Section 16(b) entirely. The standards set forth in Sections 16(a) and 16(b) are arbitrary both in the selection of time, 6 months, and the selection of amount, more than 10 percentum. A security transaction either falls within or without the scope of Section 16(b) depending on whether these arbitrary standards are met.[20] A se-

'innocent' insider who has not abused his position since the unfair use of confidential information by insiders or the intent to profit by its use is irrelevant to the question of liability under section 16(b)." Petteys v. Butler, 367 F.2d 528 (8th Cir. 1966), cert. den. Blau v. Petteys, 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967); Smolowe v. Delendo Corp., 136 F.2d 231 (2 Cir. 1943), cert. den. 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

19. See Helvering v. Gregory, 69 F.2d 809, 810 (2nd Cir. 1934): " * * * A transaction, otherwise within the exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, tax-

ation. Anyone may so arrange his affairs that his taxes shall be as low as possible; * * *" On appeal, the Supreme Court affirmed saying: "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1934).

20. Some scholars note a recent trend to be more realistic and less formalistic in applying 16(b), especially in defining what is a sale, a purchase, and a transaction within the ambit of the Act. See, Lowenfels, Section 16(b): A New Trend In Regulating Insider Trading, 54 Corn.

curity holder such as Emerson does suffer some detriment albeit small in its two short-swing transactions in that it does lose its profit acquired from its first sale, made while it was a more than 10 percentum security holder. After that sale the arbitrary standards enacted by Congress in 16(b) of a "more than 10 percentum" security holder are no longer met, and subsequent sales appear to be free of Section 16(b) regulation. Such subsequent sales literally fall within the exemption language of 16(b): "[T]his subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, * * *"

Since we have determined as a matter of law that intent as such to avoid loss of realized profits by engaging in two independent sales not legally tied to each other and made at different times to different buyers such as these described above, does not result in treating the two sales as one sale of the entire stock held, nor as one continuous transaction, we look to 16(b) to determine whether the second sale was a sale otherwise proscribed by that section. While we agree that Section 16(b) is to be broadly and liberally construed to achieve the intent of Congress, we are unable to discern from any of the Congressional hearings or from the broad basic purpose of 16(b) any intent on the part of Congress not to mean what it has literally said in the 16(b) exclusion clause, giving the words used in that clause a liberal and reasonably flexible meaning. We are not free under the guise of statutory interpretation to rewrite statutes so as to include matters which for unexpressed reasons Congress did not include.[21] We believe it clear that this second and independent sale of September 13 was not made at the time Emerson was a more than 10 percentum stockholder, whether the phrase "at the time of" be viewed as meaning immediately before, simultaneously with or immediately after the 10 percentum stockholder status. Hence, Emerson is not required to pay over to Reliance any profits realized from that sale.

Accordingly, we remand this cause to the District Court with directions to proceed in accordance with the views expressed herein.

It is so ordered.

L.Rev. 45 (1968); Petteys v. Butler, 367 F.2d 528 (8th Cir. 1966), cert. den. 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1969); Blau v. Lamb, 363 F.2d 507 (2nd Cir. 1966), cert. den. 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967).

21. It is noteworthy the preamble was in none of the bills on which public hearings were held. The bill submitted to the House by the Committee on Interstate and Foreign Commerce completely omitted the future 16(b). The bill sub-mitted by the Banking and Currency Committee to the Senate was the first to contain the preamble. See, S.Rep. 3420, 73rd Congress, 2nd Sess., 16(b), 1934; Note, Short-Swing Profits and the Ten Percent Rule, 9 Stan.L.Rev. 582, 586, N. 23 (1957).

