Michael STELLA, suing on his own behalf and on behalf of all other stockholders of Kaiser-Frazer Corporation similarly situated, Plaintiff-Appellant,

v.

GRAHAM–PAIGE MOTORS CORPORATION and Kaiser-Frazer Corporation, Defendants-Appellees.

No. 258, Docket 23899.

United States Court of Appeals Second Circuit.

Argued Feb. 17, 1956.

Decided March 29, 1956.

Lewis M. Dabney, Jr., New York City, Murray C. Bernays, New York City, of counsel, for plaintiff-appellant.

Garey & Garey, William F. Corson, New York City, for defendant-appellee.

Before CLARK, Chief Judge, and FRANK and HINCKS, Circuit Judges.

FRANK, Circuit Judge.

The facts are fully stated in the opinion of the district judge, reported in Stella v. Graham-Paige Motors Corporation, D.C., 132 F.Supp. 100.

1. The trial judge, we think correctly, adopted the reasoning of Judge Samuel Kaufman's decision, denying a summary judgment, reported in D.C., 104 F.Supp. 957, in holding that Graham-Paige, for purposes of Section 16(b), 15 U.S.C.A. § 78p, became the "beneficial owner" of 10% of the Kaiser-Frazer

stock at the very moment when Graham-Paige purchased that stock. Before Judge Kaufman, the S. E. C. filed a brief as *amicus curiae* in support of what became Judge Kaufman's interpretation.

2. We agree with the trial judge that the purchase of the stock occurred on February 10, 1947, and that therefore sales made before August 8, 1947 were within the statutory period. The date when a purchaser becomes a "beneficial owner" is that on which he "incurred an irrevocable liability to take and pay for the stock", when his "rights and obligations became fixed". Blau v. Ogsbury, 2 Cir., 210 F.2d 426, 427. Here Graham-Paige was to pay, in part, $3,-000,000 in cash. It did not have that sum when the contract with Kaiser-Frazer was made but in the contract agreed to use its best efforts to borrow that sum from a certain bank in accordance with a letter agreement. This letter agreement provided that the bank's obligation to make the loan was on condition that the Henry J. Kaiser Company would guaranty it. The agreement with Kaiser-Frazer provided, in effect, that, if Graham-Paige was unable to obtain the loan from the bank in accordance with the letter agreement, Graham-Paige had the election to terminate the agreement with Kaiser-Frazer. As the trial judge said [132 F.Supp. 105]: "There is no evidence * * * that the Henry J. Kaiser Company became bound to execute the guaranty at any time prior to the closing meeting held on February 10, 1947 when it did so." It follows that, until that date, Graham-Paige had not incurred "an irrevocable liability to take and pay for the stock." [1]

In Blau v. Ogsbury, supra, the question was when the holder of an option to buy stock became the "beneficial owner." We held that it was not (a) the date when he acquired the option, nor (b) the day when, having exercised it, he paid for the stock and obtained legal title to it, but (c) the day when he exercised the option with the result that he had then a fixed right and obligation under an executory contract. See also Park & Tilford v. Schulte, 2 Cir., 160 F.2d 984, 987 where we said that, upon the exercise of an option, the optionee becomes an "insider" and thus within the Congressional purpose to "protect the outside stockholders against at least short-swing speculation by insiders with advance information." Our reasoning was that one who holds an unexercised option is not usually in a position to obtain such information from the company. Here Graham-Paige, as long as it had an election to back out of the agreement to purchase, was not an "insider" under Section 16 (b). That election continued until the Henry J. Kaiser Company signed the guaranty of the loan on February 10, 1947.[2]

---

1. Defendant argues that the word "purchase" in Section 16(b) must be defined according to Section 3(a) (13) which provides, "When used in this chapter, *unless the context otherwise requires* * * * The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." The words we have italicized destroy defendant's contention. For the relevant portion of Section 16(b) deals with a person who is directly or indirectly "the beneficial owner" of more than 10% of any class of any registered equity security. Since Graham-Paige was not irrevocably bound to purchase until February 10, 1947, it was not previously the "beneficial owner," directly or indirectly.

2. The S. E. C.'s position on when a person becomes a "beneficial owner" by the purchase of stock coincides with our interpretation. In an opinion, the General Counsel stated:

"In my opinion an officer, director or stockholder is to be deemed to have acquired beneficial ownership of a security at the time when he takes a firm commitment for the purchase thereof, and to divest himself of such beneficial ownership at the time when he takes a firm commitment for the sale thereof. If it is necessary that certain conditions be satisfied prior to the consummation of the purchase or sale, and if it is uncertain whether such conditions will be satisfied, then it would appear that the officer, director, or stockholder would not acquire

3. The trial judge found—we think correctly—that Graham-Paige's statements of profit in the amount of $434,787.86 sufficed to establish a prima facie case for plaintiff. Significantly, the judge refused to make a finding, requested by defendant Graham-Paige, that there were no profits. But the judge apparently assumed that plaintiff, despite his prima facie case, continued to bear the burden of proving that there were profits and in what amount; therefore, as defendant's proof left the judge uncertain in this respect, he decided for the defendant. So we incline to understand the judge's reasoning as indicated, e. g., by his statement that, "Plaintiff's prima facie proof * * * has been shown to be unacceptable."

If so, we think the judge erred. In Gratz v. Claughton, 2 Cir., 187 F.2d 46 we held that, under Section 16(b), a "beneficial owner" who buys and sells within the statutory period is to be regarded as a fiduciary who breaches his duty of loyalty (i. e. his duty not to engage in self-dealing) and who, in such circumstances, must account for his profits. Elsewhere we have held that, once a cestui shows a breach of such a duty and prima facie proof of a maximum amount of profits made by the fiduciary, then the fiduciary has the burden of proving to what extent the profits were less than this maximum—especially where the fiduciary's breach is responsible for the difficulty or impossibility of proving the amount with certainty—and that consequently, if the fiduciary's proof leaves the amount uncertain, judgment goes against him for the maximum figure. See Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 177, 178; York v. Guaranty Trust Co. of New York, 2 Cir., 143 F. 2d 503, 517; Phelan v. Middle States Oil Corp., 2 Cir., 220 F.2d 593, 600–601, 613; President and Directors of Manhattan Co. v. Kelby, 2 Cir., 147 F.2d 465, 476; Upson v. Otis, 2 Cir., 155 F.2d 606; cf. Bigelow v. R. K. O. Radio Pictures, 327 U.S. 251, 265–266, 66 S.Ct. 815, 90 L.Ed. 1040; Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Package Closure Corp. v. Sealright Corp., 2 Cir., 141 F.2d 972, 979.[3]

However, since it is not entirely clear what the judge would have found—as to whether Graham-Paige discharged its proof-burden—had he read the foregoing, in the interest of justice we remand with directions that he make a specific finding on that issue, in the light of what we have said above.[4]

HINCKS, Circuit Judge (dissenting).

I would affirm on the ground that the defendant's purchase and sale of Kaiser-Frazer stock was a transaction not within the scope of § 16(b) of the Securities

---

beneficial ownership, or divest himself thereof, until such time as such conditions are satisfied and the undertaking to purchase or sell becomes a firm commitment." 11 Fed.Reg. 10968 (1946). See also, Cook and Feldman, Insider Trading Under the Securities and Exchange Act, 66 Harvard L.Rev. 385, 401–402; Rubin and Feldman, Statutory Inhibitions Upon Unfair Use of Corporate Information by Insiders, 95 U. of Pa.Law Rev. 468, 481–492 (1947).

3. The judge ruled that, because there could be but one buyer of the Graham-Paige assets, the willing-seller-willing-buyer rule of fair market value was inapplicable. Perhaps we need not consider that ruling in view of the ground of our decision. But it may be well to say that we think this ruling erroneous. The willing-seller rule is not abrogated by the absence of a market; the trier of the facts must look to other relevant evidence of the price which a buyer would pay. See United States v. Toronto, Hamilton & Buffalo Nav. Co., 338 U.S. 396, 402, 70 S.Ct. 217, 94 L.Ed. 195; United States v. Miller, 317 U.S. 369, 374–375, 63 S.Ct. 276, 87 L.Ed. 336; De La Rama S.S. Co. v. United States, 2 Cir., 206 F. 2d 651, 655; Westchester County Park Comm. v. United States, 2 Cir., 143 F.2d 688, 692.

4. If, on the basis of such a finding, Graham-Paige is liable, interest should be added from the date of sale. See Blau v. Mission Corp., 2 Cir., 212 F.2d 77, 82.

Exchange Act of 1934, 15 U.S.C.A. § 78 p(b).[1]

Immediately prior to its purchase of 750,000 shares of this stock the defendant was the owner of only 6¼% of the outstanding stock.[2] At that time, therefore, the defendant was not a "beneficial" owner within the meaning of § 16 (a) of the Act wherein a "beneficial owner" is defined as a person who owns "more than 10 per centum of any class of any equity security * * *." So far there is no dispute. Section 16(b) reaches only the "profit realized by him [*i. e.,* the beneficial owner] from any purchase and sale, or any sale and purchase, of any equity security * * *." Since profit on purchased stock is not "realized" until its sale, this—the operative clause of the Section—standing alone might be read as applying to profit realized by a person who was a "beneficial owner" at the time of his sale, irrespective of his status as a beneficial owner at the time of his prior purchase of the stock. Apparently because it recognized that this might be taken as the meaning of the operative clause, Congress added a final sentence to § 16(b), shown in the text of the Section as printed in an earlier footnote, wherein it gave its own construction of the operative clause. It there said that the subsection "shall not be construed to cover any transaction where such beneficial owner was not such *both at the time of the purchase and sale * * *.*" Although Congress did not supply the typographical emphasis appearing above, its language, especially when read in connection with the operative clause, plainly showed that it did in fact emphasize the very phrase that I have italicized. Thus in plain unambiguous language Congress said that the section does *not* apply to this defendant who though a beneficial owner at the time of sale "was not such both at the time of the purchase and sale".

I cannot go along with my brothers who adopt the reasoning and ruling of Judge Kaufman's opinion reported in 104 F.Supp. 957, 959, which Judge Dimock took as stating the law of the case. In that opinion, it was said that "There is an ambiguity" in the exclusionary sentence quoted above and, later, that the alleged ambiguity was located in the phrase " 'at the time.' " This simple phrase was thought to afford a choice between two constructions, *viz.*: "prior to" on the one hand, or "simultaneously with" on the other hand. My brothers approve Judge Kaufman's choice of the latter "construction." On that basis they hold the transaction here involved to come within § 16(b). They thereby seem to commit the court to one or the other of these two propositions: (a)

---

1. Section 16(b) of the Securities Exchange Act of 1934 provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

2. See Stella v. Graham-Paige Motors Corp., D.C., 104 F.Supp. 957.

that any purchase by an outsider of a 10% interest in a stock equity gives rise to a conclusive presumption that the purchaser had inside information as to the affairs of the corporation, or (b) that a sale for profit by a "beneficial owner" of stock in his corporation may give rise to a conclusive presumption of a breach of fiduciary duty even though the seller was under no fiduciary duty at all when he had previously purchased the stock sold. Quite independent of my difficulty in believing that Congress could have intended to subject "beneficial owners" to conclusive presumptions of such drastic scope, I think that neither of the propositions posed above are tenable. For the simple language which my brothers find ambiguous is to me crystal clear. The grammar would have been better, but the meaning no clearer, if it had read "at the time both of the purchase and of the sale." Nobody points to other provisions of the statute or to anything in its legislative history which conflicts with the plain meaning.

To give any other "construction" to such language is, in my opinion, to attribute to Congress an intent at variance with that to which it gave expression. In the face of such clear language there is no need for courts to plumb the depths of the collective legislative mind and no power in the courts to adjust the expressed intent of Congress to its supposed objective. In the case of Lake County v. Rollins, 130 U.S. 662, 9 S.Ct. 651, 652, 32 L.Ed. 1060, it was said, " * * * where a law is expressed in plain and unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction." In Packard Motor Car Co. v. National Labor Relations Board, 330 U.S. 485, 67 S.Ct. 789, 792, 91 L.Ed. 1040, the court said, " * * * it is for Congress, not for us, to create exceptions or qualifications at odds with its plain terms. * * * However we might appraise the force of these arguments as a policy matter, we are not authorized to

base decision of a question of law upon them. They concern the wisdom of the legislation; they cannot alter the meaning of otherwise plain provisions." See also Ex parte Collett, 337 U.S. 55, 69 S. Ct. 944, 959, 93 L.Ed. 1207; Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62; and Osaka Shosen Kaisha Line v. United States, 300 U.S. 98, 57 S.Ct. 356, 81 L.Ed. 532.

The opinion below cites United States v. C. I. O., 335 U.S. 106, 68 S.Ct. 1349, 1352, 92 L.Ed. 1849, wherein it was held that the word "expenditure" as used in § 304 of the Labor Management Relations Act of 1947, 2 U.S.C.A. § 251, should be interpreted in the light of the Congressional purpose. But that was because the word "has no definitely defined meaning". Also cited was S. E. C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 64 S.Ct. 120, 123, 88 L.Ed. 88, for the proposition that "the purpose of Congress is a dominant factor in the determination of a statute's meaning * * and *where a choice may be made between two possible constructions,* that construction should be chosen which would serve to effectuate Congressional purpose rather than defeat it." (Emphasis supplied.) There the problem was whether the transaction in question came within the phrases an "investment contract" or "in general, any interest or instrument commonly known as a security" as used in the definition of "security" in § 2(1) of the Securities Exchange Act, 15 U.S. C.A. § 77b(1). The court spoke of these definitions as being "of * * * variable character" and "descriptive terms" which required interpretation "in conformity with its [the] dominating general purpose" of the Act. That case, too, I think not apposite here. For the exclusionary sentence of § 16(b) did not provide "two possible constructions," nor were its provisions couched in "descriptive terms" of "variable character."

My brothers' "construction" is apparently chosen because thought to be more consonant with the Congressional purpose " 'to protect the outside stock-

holders against at least short-swing speculation by insiders with advance information.' " Shaw v. Dreyfus, 2 Cir., 172 F.2d 140, 142; Park & Tilford Inc. v. Schulte, 2 Cir., 160 F.2d 984. I accept, of course, this statement of the Congressional purpose. Notwithstanding, I think that the construction adopted by the court is in direct conflict not only with the simple language of the Act but also with its basic rationale and scheme.

By the Act, Congress recognizes that officers and directors of a corporation generally have access to advance information as to its condition and prospects which when released to the public may sharply affect the market value of its stock. It seeks to hold these fiduciaries accountable to the corporation for personal profits made by them through trading in its stock *on the basis of such advance information.* And so, in recognition of the difficulty of proving that they actually had advance information which actuated their trading, the Act conclusively presumes that one who, while an *officer or director,* makes both a *purchase and sale* within so short a period as six months was actuated by advance information actually received. Congress recognized further that large stockholders also often have a dominant voice in management and hence have access to advance information. Such stockholders, as well as officers and directors, thus have the qualifications of "insiders." Consequently, Congress adopted a provision whereby those owning 10% or more of the stock should as "beneficial owners" be included amongst the insiders, apparently thinking that provision to be at least roughly consonant with the realities of intracorporate relationships and desirable in that it would serve as an accurate definition of the class adequate for the guidance of the commercial public, and would facilitate the proofs necessary for enforcement litigation under the Act.

But the basic rationale of the Act was such that only completed swing transactions gave rise to the presumption of unethical use of advance information: if one purchased stock on one day, became a director on the next, and sold some of his stock on the next, any resulting profit was not recoverable by the corporation apparently because a sale alone was thought to be insufficient basis for a drastic presumption that it had been made in violation of a fiduciary duty. In principle, the same rationale is equally applicable to beneficial owners who do not become such until a given purchase is consummated. Under that rationale, the presumption will arise only when both the purchase and the sale were made by one who at the time was a fiduciary.

It is true that if the Act gives consistent effect to this rationale, it makes it possible for one who actually had advance information but was not a beneficial owner at the time of his purchase, to evade the Act, as was observed by Judge Kaufman in his opinion below. And under the same rationale, it excludes from accountability persons, like the defendant here, who until their purchases were consummated lacked even access to advance information. On the other hand, the Act, under my brothers' "construction" sanctions one or both of the propositions stated in an earlier paragraph of this opinion.

It was of course for Congress, not the courts, to weigh the conflicting policies affecting the scope which it should give to the Act. It decided to bring "beneficial owners" within the Act. But the extent to which they should be held accountable was unmistakably indicated by the final exclusionary sentence of § 16 (b). It obviously thought it better, at least for the time being, to leave in the Act a loophole for some who, under the basic rationale, deserved to be held to accountability, than to suck into a suffocating dragnet many who, under the same rationale, could not justly be so held.