**John BERSHAD, Plaintiff-Appellee,**

v.

**Bernard P. McDONOUGH, Defendant-Appellant.**

**No. 17810.**

United States Court of Appeals, Seventh Circuit.

June 11, 1970.

Rehearing Denied Aug. 5, 1970.

694

Herbert Underwood, Clarksburg, W. Va., R. V. Houpt, Chicago, Ill., Thomas E. Walsh, Washington, D. C., Peer Pedersen, Chicago, Ill., for appellant.

Jerome H. Stein, Chicago, Ill., Lawrence Milberg, Great Neck, N. Y., Melvyn I. Weiss, David J. Bershad, New York City, of counsel for appellee.

Before SWYGERT, Chief Judge, CUMMINGS, Circuit Judge, and GRANT, District Judge.[1]

See publication Words and Phrases for other judicial constructions and definitions.

———◆———

CUMMINGS, Circuit Judge.

This appeal is from a summary judgment in favor of the plaintiff, a common stockholder in the Cudahy Company of Phoenix, Arizona. ·Plaintiff brought this action under Section 16(b) of the Securities Exchange Act of 1934 (15

[1]. Chief Judge Grant of the United States District Court for the Northern District of Indiana is sitting by designation.

U.S.C. § 78p(b)) to recover for Cudahy's benefit the "short-swing" profits coming to defendant from his and his wife's purchase and sale of 272,000 shares of Cudahy common stock.

On March 15 and 16, 1967, defendant Bernard P. McDonough and his wife Alma, who reside in Parkersburg, West Virginia, each purchased 141,363 shares of Cudahy common stock at $6.75 per share, totaling over 10% of the outstanding common stock of Cudahy.[2] Soon after the purchase, McDonough was elected to the Cudahy Board of Directors and named Chairman of the Board.[3] At the same time, Donald E. Martin and Carl Broughton, business associates of McDonough, were elected to the Cudahy Board.

On July 20, 1967, in Parkersburg, West Virginia, Mr. and Mrs. McDonough and Smelting Refining and Mining Co. ("Smelting") entered into a formal "option agreement" granting Smelting the right to purchase 272,000 shares of the McDonoughs' Cudahy stock. Smelting paid $350,000 upon execution of the agreement, which set the purchase price for the shares of $9 per share, or a total of $2,448,000. The option was exercisable on or before October 1, 1967. The $350,000 was to be applied against the purchase price but was to belong to the McDonoughs if Smelting failed to exercise the option. Accompanying this "option" was an escrow agreement under which the McDonoughs' 272,000 shares of Cudahy stock were placed in escrow with their lawyer. They also simultaneously granted Smelting an irrevocable proxy to vote their 272,000 shares of stock until October 1, 1967.

A day or two after the documents were signed, Mr. McDonough and Carl Broughton, his business associate, acceded to the request of Smelting and agreed to resign from the Cudahy Board if Smelting representatives were put on the Board. Both of them resigned as directors on July 25, 1967. About that time, five nominees of Smelting were placed on the Cudahy Board. Smelting subsequently wrote the McDonoughs on September 22, 1967, that it was exercising its option. The closing took place in Parkersburg five days later, with the $2,098,000 balance of the purchase price being paid to the McDonoughs through the escrow agent. From their sales, Mr and Mrs. McDonough realized a profit of $612,000.

In the court below, defendant contended that under West Virginia law the July 20 agreement constituted an option contract with Smelting, and not a contract for the sale of the Cudahy stock. Graney v. United States, 258 F.Supp. 383, 386 (S.D.W.Va.1966), affirmed per curiam, 377 F.2d 992 (4th Cir. 1967), certiorari denied, 389 U.S. 1022, 88 S.Ct. 594, 19 L.Ed.2d 668. A stock option, he argued, does not qualify as a "sale or contract for sale" for purposes of applying the rule of Section 16(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78p (b)).[4] The district court, however, took another view of the transaction. In a thoughtful memorandum opinion, the trial judge looked beyond the formal wording of the July 20 "option" and

---

2. At all times relevant to this case the stock of Cudahy Company was listed on the New York Stock Exchange.

3. McDonough resigned as chairman on July 18, 1967.

4. In pertinent part, Section 16(b) provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. * * *" (15 U.S.C. § 78p(b)).

concluded that the transaction between the McDonoughs and Smelting "amounted to a sale or a contract of sale" within the terms of the Securities Exchange Act. Since this event occurred less than six months after the McDonoughs had purchased the Cudahy stock, under Section 16(b) summary judgment for $612,000, together with interest, was entered for plaintiff. We affirm.

■ Section 16(b) was designed to prevent speculation in corporate securities by "insiders" such as directors, officers and large stockholders. Congress intended the statute to curb manipulative and unethical practices which result from the misuse of important corporate information for the personal aggrandizement or unfair profit of the insider. Congress hoped to insure the strict observance of the insider's fiduciary duties to outside shareholders and the corporation by removing the profit from shortswing dealings in corporate securities. Conversely, Congress sought to avoid unduly discouraging bona fide long-term contributions to corporate capital. See Blau v. Lamb, 363 F.2d 507, 514–516 (2d Cir. 1966), certiorari denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542; Petteys v. Butler, 367 F.2d 528, 532 (8th Cir. 1966), certiorari denied sub nom. Blau v. Petteys, 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545; Blau v. Max Factor & Co., 342 F.2d 304, 308 (9th Cir. 1965), certiorari denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150; Smolowe v. Delendo, 136 F.2d 231, 237–239 (2d Cir. 1943), certiorari denied, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446.

In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect. See Petteys v. Butler, supra, 367 F.2d at pp. 532–533; Smolowe v. Delendo, supra, 136 F.2d at pp. 236–237; Blau v. Lamb, supra, 363 F.2d at p. 515. The harshness of the rule was mitigated, however, by confining its coverage to a period of six months, thereby ensuring the minimum adverse effect upon valuable, long-term investments and at the same time facilitating easy and certain compliance with the strictures of Section 16(b). The thrust of the statutory scheme thus placed responsibility for meticulous observance of the provision upon the shoulders of the insider. He was deemed capable of structuring his dealings to avoid any possibility of taint and therefore must bear the risks of any inadvertent miscalculation. Cf. Polaroid Corp. v. Casselman, 213 F.Supp. 379, 382 (S.D.N.Y.1962); see generally, II Loss, Securities Regulation, Ch. 6C, pp. 1040, et seq. (2d ed. 1961).

■ Under Section 3(a) (14) of the Act (15 U.S.C. § 78c (a) (14)), the "sales" covered by Section 16(b) are broadly defined to include "any contract to sell or otherwise dispose of" any security. See SEC v. National Securities, Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668, n. 8. Construction of these terms is a matter of federal law (see Tcherepnin v. Knight, 389 U.S. 332, 337–338, 88 S.Ct. 548, 19 L.Ed.2d 564; Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403), and "[w]hatever the terms 'purchase' and 'sale' may mean in other contexts," they should be construed in a manner which will effectuate the purposes of the specific section of the Act in which they are used. SEC v. National Securities, Inc., 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668. Applying this touchstone, courts have generally concluded that a transaction falls within the ambit of Section 16(b) if it can reasonably be characterized as a "purchase" or "sale" without doing violence to the language of the statute, and if the transaction is of a kind which can possibly lend itself to the speculation encompassed by Section 16(b). Blau v.

Lamb, 363 F.2d 507, 518 (2d Cir. 1966), certiorari denied, 385 U.S. 1002, 87 S.Ct. 707; Petteys v. Butler, 367 F.2d 528, 532 (8th Cir. 1966), certiorari denied *sub nom.* Blau v. Petteys, 385 U.S. 1006, 87 S.Ct. 712; Heli-Coil Corporation v. Webster, 352 F.2d 156, 162 (3d Cir. 1965); Blau v. Max Factor & Co., 342 F. 2d 304, 307 (9th Cir. 1965), certiorari denied, 382 U.S. 892, 86 S.Ct. 180; Blau v. Lehman, 286 F.2d 786, 792 (2d Cir. 1960), affirmed, 368 U.S. 403, 82 S.Ct. 451; Ferraiolo v. Newman, 259 F.2d 342, 345 (6th Cir. 1958), certiorari denied, 359 U.S. 927, 79 S.Ct. 606, 3 L.Ed.2d 629.[5]

██ The phrase "any purchase and sale" in Section 16(b) is therefore not to be limited or defined solely in terms of commercial law of sales and notions of contractual rights and duties. Cf. Dasho v. Susquehanna Corp., 380 F.2d 262, 266 (7th Cir. 1966), certiorari denied *sub nom.* Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470; Lawrence v. SEC, 398 F.2d 276, 280 (1st Cir. 1968); Vine v. Beneficial Finance Co., 374 F.2d 627, 634 (2d Cir. 1967), certiorari denied, 389 U.S. 970, 88 S.Ct. 463, 19

L.Ed.2d 460. Applicability of this Section may depend upon the factual circumstances of the transaction, the sequence of relevant transactions, and whether the insider is "purchasing" or "selling" the security. Cf. Blau v. Lamb, 363 F.2d 507, 523–524 (2d Cir. 1966), certiorari denied, 385 U.S. 1002, 87 S.Ct. 707. By the same token, we conclude transactions subject to speculative abuses deserve careful scrutiny. The insider should not be permitted to speculate with impunity merely by varying the paper form of his transactions. The commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock. Cf. Blau v. Allen, 163 F.Supp. 702, 705–706 (S.D.N.Y.1958).

██ The considerations thus guiding the application of Section 16(b) provide substantial support for coverage of an insider's sale of an option within six months of his purchase of the underlying security. The utility of various stock options as a tool of speculation is well recognized.[6] As noted in Booth v. Varian Associates, 334 F.2d 1, 4 (1st Cir.

5. The basic principle of the rule has frequently been relied upon by some courts to exclude from liability certain stock conversions which might otherwise be deemed within the coverage of the Section 16 (b) prohibition. See generally, II Loss, Securities Regulation, Ch. 6C, pp. 1066–1072 (1961), and V Loss, Securities Regulation, Ch. 6C, pp. 3031–3040 (Supplement to Vol. II, 1969); see also, L. D. Lowenfels, Section 16(b): A New Trend in Regulating Insider Trading, 54 Corn. L.Q. 29 (1968); Note, The Scope of "Purchase and Sale" Under Section 16 (b) of the Exchange Act, 59 Yale L.J. 510 (1950). We do not feel obliged to enter the debate over the "objective" versus "pragmatic" approach which has consumed courts faced with transactions that are apparently "sales" but without risk of speculative abuses and insider profiteering. The "pragmatic" approach has never been extended to immunize transactions in which potential abuses of inside information can be seen. On the other hand, the "objective" or "rule of thumb" approach need not compel a court to wink at the substantial effects of a transaction

which is rife with potential sharp practices in order to preserve the easy application of the short-swing provisions under Section 16(b). Certainly the interest of simple application of the prohibitions of Section 16(b) does not carry so far as to facilitate evasion of that provision's function by formalistic devices. Cf. Newmark v. RKO General, Inc., 425 F.2d 348 (2d Cir. 1970).

6. See Note, The Scope of "Purchase and Sale" Under Section 16(b) of the Exchange Act, 59 Yale L.J. 510, 513–523 (1959); compare Hardee, Stock Options and the "Insider Trading" Provisions of the Securities Exchange Act, 65 Harv.L. Rev. 997 (1952) with Cook and Feldman, Insider Trading Under The Securities Exchange Act, 6 Harv.L.Rev. 612, 617–624 (1953); see also Comment, Put and Call Options Under Section 16 of the Securities Exchange Act, 69 Yale L.J. 868 (1960); Michaely & Lee, Put and Call Options: Criteria for Applicability of Section 16(b) of the Securities Exchange Act of 1934, 40 Notre Dame Law. 239 (1965). The primary focus has been

1964), certiorari denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556:

> "Options, conversions and similar devices have lent themselves quite readily to the abuses uncovered in the Congressional investigation antedating the Act, and in order to give maximum support to the statute courts have attempted to include these transactions by characterizing them as purchases or sales."

The insider's sale of options in his stock is well adapted to speculation and abuse of inside information whether or not the option is subsequently exercised. The sale of the right to purchase the underlying security is itself a means of realizing a profit from that security. The right to purchase stock at a given price under specified circumstances, although clearly not identical to the rights attendant upon ownership of the stock itself, derives from and is dependent upon the value of the underlying security. Sale of such purchase rights provides an easy vehicle for the use of inside information in extracting profits from the stock itself. Where the option is ultimately exercised, moreover, the exact date of exercise may be unimportant to the substance of the transaction from the point of view of the insider-vendor, since he can exploit his position in the corporation by setting the terms of sale in the option. In addition, parties frequently provide that the option price shall be considered a retroactive down payment of the purchase price of the stock sold upon exercise of the option. Under such circumstances, it may be reasonable to hold the parties to their own treatment of the transaction and date the "sale" of the stock at the purchase of the option rather than its exercise. Cf. Booth v. Varian Associates, 334 F.2d 1, 4 (1st Cir. 1964), certiorari denied, 379 U.S. 961, 85 S.Ct. 651; Michaely & Lee, Put and Call Options: Criteria for Applicability of Section 16(b) of the Securities Exchange Act of 1934, 40 Notre Dame Law. 239 (1965).

■ It is unnecessary, however, to rely solely upon these considerations to conclude that the McDonoughs' "sale" of the Cudahy stock to Smelting took place well in advance of the exercise of the option on September 22. The circumstances of the transactions clearly indicate that the stock was effectively transferred, for all practical purposes, long before the exercise of the option. The $350,000 "binder" ostensibly paid for the option represented over 14% of the total purchase price of the stock. Granting the magnitude of the sale contemplated, the size of the initial commitment strongly suggests that it "was not just a binder." Cf. Blau v. Allen, 163 F.Supp. 702, 705 (S.D.N.Y.1958). The extent of that payment represented, if not the exercise of the option, a significant deterrent to the abandonment of the contemplated sale. In addition, the reverse side of the "Option Agreement" contained provisions for the transfer of the Cudahy stock, endorsed in blank, to an escrow agent pending completion of the transaction. At the same time, the McDonoughs delivered an irrevocable proxy to Smelting to vote the 272,000 shares at any regular or special shareholders' meetings. Within a few days, McDonough and one of his associate directors resigned and were replaced by representatives of Smelting's interests, including the Chairman of the Board of Directors of Smelting, and the president and director of that corporation. Significantly, only a few days after the expiration of the six-month period from the McDonoughs' purchase of the Cudahy stock, Smelting formally exercised its option and, on the same day that Smelting mailed its notification, the McDonoughs executed the necessary stock powers.

Defendant finally contends that these facts were insufficient to support the

---

on the abuses of somewhat different options than present in this case. However, the possible distinctions do not indicate that the insider here may not speculate

with the special information he acquires, but only that his ability to maximize his profits from such utilization of inside information is somewhat diminished.

district court's grant of summary judgment in favor of plaintiff. We cannot accept this contention. The question in this case, unlike Blau v. Allen, 163 F. Supp. 702, 705 (S.D.N.Y.1958), involves the determination not of the existence of the sale, but the date to be ascribed to the transfer under Section 16(b). The basic facts in this case are undisputed and far exceed those present in *Allen*. We conclude that as a matter of law, the sale was effectively accomplished within the six-month period contemplated by Section 16(b). Cf. Booth v. Varian Associates, 334 F.2d 1 (1st Cir. 1964), certiorari denied, 379 U.S. 961, 85 S.Ct. 651. Consequently, the motion for summary judgment was properly granted.

Affirmed.