John R. RISEMAN, Plaintiff, Appellant,

v.

ORION RESEARCH, INC., et al.,
Defendants, Appellees.

No. 84–1315.

United States Court of Appeals,
First Circuit.

Argued Oct. 2, 1984.

Decided Nov. 28, 1984.

Robert J. Schiller, Jr., Newton Center, Mass., for plaintiff, appellant.

John R. Stopa, Cambridge, Mass., for defendants, appellees Orion Research, Inc., Robert F. Birch, Louis B. Barnes, Richard D. Condon, David A. Hatch, Alexander Jen-

kins, III, William M. Karlyn, James W. Ross, Jr., and Robert B. Schmidt.

Before COFFIN, Circuit Judge, TIMBERS,* Senior Circuit Judge, and BOWNES, Circuit Judge.

BOWNES, Circuit Judge.

This appeal presents another "date of purchase" wrinkle in the tapestry of insider liability for short-swing profits under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Appellant John H. Riseman appeals from the judgment of the United States District Court for the District of Massachusetts holding him liable for profits realized from the alleged exercise of his option to purchase Orion Research, Inc., securities within a six-month period.

The facts in this case are not in dispute. Riseman served as President and Chairman of the Board of Orion Research, Inc. (Orion) from 1962 to December of 1981. He also owned more than 10% of Orion's outstanding stock. After relinquishing his position as chairman, Riseman continued on as a director. In January of 1982, while Riseman was a director, the Orion board voted to grant stock options to certain Orion directors, including Riseman, who were believed to have an interest in acquiring stock as an investment. The options, exercisable for five years, enabled the holders to purchase 1,000 shares at the price of $7.10 per share. Because Orion did not intend to register the option securities pursuant to § 5 of the Securities Act of 1933,[1] its board of directors structured the option agreement to permit Orion to take advantage of the § 4(2) "private offering" exemption. Securities Act of 1933 § 4(2), 15

U.S.C. § 77d(2). The S.E.C.'s Rule 146, the private offering "safe harbor" rule in effect at the time of the granting of the options, guaranteed § 4(2) status if, *inter alia*, the issuer (Orion) restricted its offer to "sophisticated" investors (or their advisees) who possessed the knowledge and experience to properly evaluate the security and who had access to information equivalent to that which a registration statement would disclose. S.E.C. Rule 146, 17 C.F.R. § 230.146 (1976). *See S.E.C. v. Ralston Purina Co.*, 346 U.S. 119, 126–27, 73 S.Ct. 981, 985, 97 L.Ed. 1494 (1953); *Doran v. Petroleum Management Corp.*, 545 F.2d 893, 900 (5th Cir.1977).[2] If Orion had sold the unregistered option stocks to anyone without access to investment information or if a director had acquired option securities with a view toward resale to a member of the public, Orion could face liability for violations of the registration requirements. S.E.C. Release No. 4552 (Nov. 6, 1962), C.F.R. § 231.4552 (1984) (release noted), Fed.Sec.L.Rptr. (CCH) ¶ 2770 (1973); *Woolf v. S.D. Cohn and Co.*, 515 F.2d 591, 611 (5th Cir.1975) (en banc), *vacated on other grounds*, 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976).

In order to prevent an ex-director who no longer had access to investment information from acquiring an option security, Orion included a provision in the option that caused it to lapse if the holder ceased to be a director. In order to prevent a director from reselling an unregistered security to an uninformed member of the public, the Orion board drafted the first provision of the option as follows:

> As a condition precedent to any exercise of this option, the Holder shall present to

---

* Of the Second Circuit, sitting by designation.

1. Section five of the Securities Act of 1933 generally requires the registration of all securities publicly offered by a company or persons controlling a company, and the use of a prospectus in connection with such public offering. The prospectus must disclose all material investment information. 15 U.S.C. § 77e, j.

2. In March of 1982, the S.E.C. revised Rule 146 and several other § 5 exemptions into a new

comprehensive Regulation D. *See* C.F.R. § 230.500 (1984). Under Rule 506 of Regulation D, the S.E.C. has slightly expanded the class of possible purchasers, clarified the information disclosure requirements, and has removed the limits on the number of certain types of sophisticated purchasers. Even if Riseman's conduct in September of 1982 were viewed in the light of Regulation D, our analysis under the facts of this case would remain the same.

the Company a statement in writing that the option is then being exercised only with a view to investment in, and not with a view to the disposition of, the shares with respect to which the option is then being exercised; provided, however, that the restriction imposed by this paragraph shall be inoperative upon the registration with the Securities and Exchange Commission of the stock subject to this option or acquired through the exercise of this option.

In August of 1982, eight months after Riseman had been granted the option, the board of directors decided not to renominate him for a board seat. Although Riseman independently sought proxies, he lost his position on the board on September 13, 1982. Earlier that day, undoubtedly seeing the writing on the wall, Riseman directed his attorney to deliver to Orion a check in the amount of $7,100, the exact cost of a complete exercise of his option. Orion promptly cashed Riseman's check and sent him an "investment representation" letter to document Riseman's understanding that he was to hold the securities for investment purposes. Riseman deliberately did not sign the letter and Orion did not deliver the stock. In November 1982, an Orion director contacted Riseman and urged him to sign the letter; Riseman refused. On November 11th and 12th, less than two months after Riseman had tendered the stock option check to Orion, he sold 4,600 shares of Orion stock at $17.00 and $18.50 per share. In March of 1983 Riseman made a large sale which reduced his holdings below 10% so that he ceased to be a § 16 "insider." On April 13, 1983, although Riseman still had not signed the investment representation letter, Orion sent Riseman a stock certificate representing the 1,000 shares of stock for which Orion was paid the previous September. Riseman accepted the certificates. On June 7, 1983, Riseman received a letter from Orion charging him with violating § 16(b) and threatening to sue to collect his profits. Riseman immediately filed a complaint requesting a declaratory judgment that he had not purchased and sold within a six-month period so as to violate § 16(b). Orion counterclaimed for Riseman's alleged November 1982 short-swing profits of $11,400 and prevailed on cross-motions for summary judgment.[3]

Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), provides, *inter alia*, that a corporation may recover for itself the profits realized by an officer or director of a company or an owner of more than 10% of its shares from a purchase and sale of its stock within any period of less than six months. An officer or director need only hold the position at the time of purchase or sale to be a statutory insider. An owner must hold more than 10% at both the time of the purchase and sale to come within § 16(b).[4] Section 16(b) of the Act was enacted expressly for the purpose of preventing the unfair use of information which may have been obtained

---

**3.** Riseman also amended his complaint to add a pendent claim under M.G.L.A. § 93A against Orion's directors. The directors successfully moved to dismiss the pendent claim and Riseman has not contested that dismissal on appeal.

**4.** Section 16(b) states in relevant part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months ... shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months .... This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

15 U.S.C. § 78p(b). The term "such beneficial owner" refers to one who owns "more than 10 per centum of any class of any equity security (other than an exempted security) which is registered pursuant to section 78*l* [§ 12] of this title." 15 U.S.C. § 78p(a).

by a beneficial owner, director, or officer by reason of his relationship to the issuer. Any profit realized by such insider from any purchase and sale, or any sale and purchase, of any equity security of the issuer within a six-month period can be recovered by the issuer irrespective of any intention on the part of the insider to use or benefit from inside information. *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972); *Petteys v. Butler,* 367 F.2d 528, 532 (8th Cir.1966), *cert. denied,* 385 U.S. 1006, 87 S.Ct. 712, 17 L.Ed.2d 545 (1967).

Orion contends that Riseman, while both a director and 10% shareholder insider, exercised his option and "purchased" 1,000 shares of Orion stock in September of 1982 when he delivered the check for the purchase price.[5] If their contention is correct, Riseman's sale in November of 1982 occurred within six months of his September purchase and the company can recover the profits on the matching purchase and sales, *i.e.,* the profits on 1,000 of the shares sold. Riseman contends that the purchase occurred on April 13, 1983, when Orion waived the condition precedent and sent him the stock certificates. If April 13th is deemed to be the date of purchase, Riseman is not liable for his profits since he was then no longer a ten percent shareholder and was not a director at either the time of sale or purchase.

In order to achieve the congressional purpose of curbing short-swing speculation while not extending the reach of the statute beyond its intended limits, courts have essentially followed a two-step analysis to determine whether, or at what point, an "unorthodox transaction"[6] becomes a purchase for purposes of § 16(b). *Kern County Land Co. v. Occidental Corp.,* 411 U.S. 582, 593–94, 93 S.Ct. 1736, 1744, 36 L.Ed.2d 503 (1973). First, the court must look to see if a transaction can reasonably be defined as a purchase. Bearing in mind that unorthodox transactions can create endless opportunity for creative date dodging, we initially cast a wide net; "every transaction which can reasonably be defined as a purchase will be so defined . . . ." *Champion Home Builders v. Jeffress,* 490 F.2d 611, 615 (6th Cir.), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). Second, the court must "inquire whether the transaction may serve as a vehicle for the evil which Congress sought to prevent," namely, insider speculation. *Kern County v. Occidental Corp.,* 411 U.S. at 594–95, 93 S.Ct. at 1744–45; *Booth v. Varian Associates,* 334 F.2d 1, 4 (1st Cir.1964) *cert. denied,* 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965); *Bershad v. McDonough,* 428 F.2d 693, 696 (7th Cir. 1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); *Blau v. Lamb,* 363 F.2d 507, 518 (2d Cir.1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967). To avoid purposeless harshness, a transaction is held not to be a § 16(b) "purchase" if it "was not one that could have lent itself to the practices which Section 16(b) was enacted to prevent." *Blau v. Max Factor and Co.,* 342 F.2d 304, 307 (9th Cir.), *cert. denied,* 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965).

### *"Purchase" Considerations*

In considering whether the September payment could reasonably be regarded as a purchase, we bear in mind that construction of the term "purchase" is a matter of federal law. *Bershad v. McDonough,* 428 F.2d at 696. Under federal law, it is well settled that an insider acquires stock for purposes of § 16(b) when he has incurred an irrevocable liability to

---

5. The parties do not dispute that the exercise of an option is a purchase within § 16(b). *See, e.g., Blau v. Ogsbury,* 210 F.2d 426, 427 (2d Cir.1954); *Lewis v. Realty Equities Corp. of New York,* 396 F.Supp. 1026, 1029 (S.D.N.Y.1975); *Lewis v. Adler,* 331 F.Supp. 1258, 1266 (S.D.N.Y. 1971).

6. The term "unorthodox transaction" has been applied to stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights, and warrants. *See* L. Loss, *Securities Regulation* 1069 (2d ed. 1961).

take and pay for the stock and his rights and obligations have become fixed even though the formalities necessary for the transfer of title may not have yet occurred. *Provident Securities Co. v. Foremost-McKesson, Inc.*, 506 F.2d 601, 606–07 (9th Cir.1974), *aff'd*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976); *Champion Home Builders Co. v. Jeffress*, 490 F.2d at 615; *Silverman v. Landa*, 306 F.2d 422, 424 (2d Cir.1962); *Blau v. Ogsbury*, 210 F.2d 426, 427 (2d Cir.1954).

Riseman contends that he tendered the September check in order to "preserve" his option after he ceased to be a director and that such payment did not create an irrevocable obligation to take and pay for the stock where a material precondition remained unfulfilled. In considering the appropriate significance to be given to the "condition precedent" it is necessary to survey the circumstances in which Riseman makes his claims. Riseman had served on the Orion Board of Directors in various other executive capacities for twenty years when the stock option resolution came up for a board vote. Although the details of the board discussion at the time of adoption were not recorded, it is obvious that the option agreement was intended to be structured so that the underlying securities could be sold within the § 4(2) private offering exemption. Riseman attended the meeting, voted on the motion, received the option agreement, and sought to take advantage of the option. Clearly, Riseman knew or should have known that an option could not be exercised by anyone who no longer was privy to the type of information that would be contained in a registration statement. Moreover, the option agreement, itself, stated that if a holder ceased to be a director before the next annual stockholders' meeting the option terminated immediately. We find it hard to believe that Riseman, a director with a fiduciary obligation to Orion, did not intend to purchase the securities when he paid the purchase price on the last day he could safely purchase without exposing Orion to possible § 5 liability and when the option, by its own terms, could (and did) terminate the following day. Apart from other considerations, we would find it difficult to support an interpretation of "purchase" that would permit Riseman to escape remedial liability by trying to force the company to whom he owed a fiduciary duty to risk a violation of the registration provisions of the securities laws and subject itself to substantial criminal and civil liabilities.[7]

Although other courts in very different factual circumstances have found that a "purchase" did not occur until the performance of a condition precedent, those cases are distinguishable from the case before us. In *Booth v. Varian Associates*, 334 F.2d 1 (1st Cir.1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965), this court found that a "firm agreement" was not a purchase where the purchase price and the amount of stock to be purchased remained unfixed and was not actually known until the day prior to the closing, nearly three and one-half years after the agreement was made.[8] In *Stella v. Graham-Paige Motors Corp.*, 232 F.2d 299 (2d Cir.), *cert. denied*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956), the Second Circuit found that where a "letter agreement" provided that the buyer would use its best efforts to borrow the amount necessary to make the down payment on the stock, but if the purchaser were unable to obtain the loan the seller could terminate

---

7. The flagrant betrayal of their fiduciary duties by directors and officers of corporations who abused their positions of trust by using information for their personal gain was among the most destructive practices uncovered in the subcommittee hearings at the time of the adoption of the security acts. S.Rep. No. 1455, 73d Cong.2d Sess. 55 (1934). *See also* 10 Sec.Ann.Rep. 50 (1944); J. Seligman, *The Transformation of Wall Street* 1–38 (1982).

8. In choosing between the contended purchase dates, the court noted that speculation against an unknown purchase price was practically impossible and that the length of time between the negotiation of the agreement and its execution meant that the § 16(b) statute of limitations would have precluded recovery if the first date were chosen. *Booth v. Varian Associates*, 334 F.2d 1, 4 (1st Cir.1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965).

the agreement, no "purchase" had occurred. *Id.* at 301. In *Stella*, the condition precedent was subject to the actions of a third person and the buyer was obligated to use good faith efforts to secure the fulfillment of the condition. In this case, Riseman, alone, controlled the completion of the contract and only his attempt to avoid the clear requirements of the option caused the contract to remain in limbo. *See Champion Home Builders v. Jeffress*, 490 F.2d at 619 (Good faith can be relevant to classifying a transaction as a purchase or sale within the scope of § 16(b).).

In *Portnoy v. Revlon*, 650 F.2d 895 (7th Cir.1981), the court found that neither a "letter of intent" nor an agreement constituted a purchase under § 16(b) where a merger agreement contained five conditions precedent including such items as a favorable IRS ruling, an opinion from a specific accounting firm that the merger would be treated as a "pooling of interests," and consummation of several employment agreements. The conditions precedent were in the control of third parties, and were performed before consideration was given. As in *Stella*, the *Portnoy* court interpreted the prepurchase agreements to commit the purchaser and seller to proceed in good faith. *Id.* at 899.

The court in *Lewis v. Realty Equities Corp. of New York*, 373 F.Supp. 829 (S.D. N.Y.1974), when faced with a choice between a purchase date that corresponded to the fulfillment of a condition precedent or a subsequent closing date at which an acquisition was consummated by payment and the transfer of the stock, chose the latter, both because the closing transaction resembled the conventional exercise of an option and because the court sought the interpretation which provided the broadest coverage for § 16(b). *Id.* at 831–32.

In spirit, this case is most akin to *Bershad v. McDonough*, 428 F.2d 693 (7th

Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971), wherein two persons purchased more than ten percent of the issuer's stock and became beneficial owners or insiders. Less than six months later, the insiders entered into an agreement to sell virtually all their stock at a substantial profit. At the time of the agreement, the insiders accepted 14% of the purchase price as an option or "binder," and delivered their stock to an escrow agent. After the six-month period had elapsed, the purchaser paid the balance and the shares were transferred. The court rejected defendants' contentions that the sale had not occurred until the stock was transferred, stating: "the insider should not be permitted to speculate with impunity merely by varying the paper form of his transactions. The commercial substance of the transaction rather than its form must be considered, and courts should guard against sham transactions by which an insider disguises the effective transfer of stock." *Id.* at 697.

In Riseman's own affidavit he claims that the purpose of giving the $7,100 check to Orion on the last day of his directorship was to preserve his ability to get the stock which the option agreement plainly stated terminated when he ceased to be a director. Essentially, by paying the purchase price, Riseman sought to make Orion's obligation to deliver the shares irrevocable. We think it plain he could not do so while at the same time postponing his "purchase" date by deliberately refusing to comply with the terms of the option.[9]

*Opportunity for Speculation*

"Our inquiry, however, does not end here. The transaction also must be examined to determine if there was potential for speculative abuse." *Champion Home Builders v. Jeffress*, 490 F.2d at 617. *See also Kern County Land Co. v. Occidental*

---

**9.** We note that Riseman's refusal to sign the letter tends to distort what would normally have been a simple cash for stock purchase. If Riseman had paid for the shares on September 13th, promptly signed the investment letter on September 17th, and Orion had shortly thereafter delivered the shares, Riseman could not have been held liable for profits from a sale on March 16th, more than six months after he tendered the purchase price but less than six months after he returned the investment letter or the shares were delivered.

Corp., 411 U.S. at 595, 93 S.Ct. at 1745. In making the determination, the intent of the parties is irrelevant to determining § 16(b) liability. *Booth v. Varian Associates,* 334 F.2d at 3. "Section 16(b) is a 'prophylactic' rule whose purpose is to control the insiders whose access to confidential information gives them unfair advantage in the trading of corporate securities." *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 428, 92 S.Ct. 596, 602, 30 L.Ed.2d 575 (1972) (Douglas, J., dissenting). *See Petteys v. Butler,* 367 F.2d at 532; *Smolowe v. Delendo Corp.,* 136 F.2d 231, 235–36 (2d Cir.), *cert. denied,* 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943).

Riseman argues that because the option price was set by the company and was not subject to market fluctuation, and because he would not have been able to sell the option stock until he received the certificates, there was no possibility he could speculate in his September-to-April posture. But buying and reselling the same stock within a six-month period is not the only speculation abuse to which § 16(b) is addressed. Numerous opportunities for speculation would arise if "conditions precedent" that are within the control of the seller or purchaser could be written into option contracts to postpone the date of "purchase" for purposes of § 16(b). For instance, in a rising market, insiders could use their condition precedent as a safety net so that they could purchase their option shares while retaining the freedom to sell other shares before the end of the six-month period proscribed by § 16(b). Other courts and commentators have urged that stock certificates or title is not crucial to speculation. *See Bershad v. McDonough,* 428 F.2d at 697; *Blau v. Ogsbury,* 210 F.2d at 427. *See also* Michaely and Lee, *Put and Call Options: Criteria for Applicability of Section 16(b) of the Securities Exchange Act of 1934,* 40 Notre Dame Law 239 (1965); Note, *The Scope of "Purchase and Sale" Under Section 16(b) of the Exchange Act,* 59 Yale L.J. 511 (1950).

For the foregoing reasons, the judgment of the district court granting summary judgment to Orion Research for Riseman's short-swing profits is affirmed.

*Prejudgment Interest*

Riseman also contends that the assessment of 8% prejudgment interest running from the date Orion filed its counterclaim to recover Riseman's short-swing profits was unwarranted. "An award of prejudgment interest in a case involving violations of securities laws rests within the equitable discretion of the district court to be exercised according to considerations of fairness." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 516 F.2d 172, 191 (2d Cir.1975), *rev'd on other grounds,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). *Accord Blau v. Lehman,* 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); *Whittaker v. Whittaker Corp.,* 639 F.2d 516, 533 (9th Cir.), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981). A reviewing court will upset the district court's decision granting or denying prejudgment interest only if it is so unfair or so inequitable as to require it. *Blau v. Lamb,* 363 F.2d at 528; *Western Auto Supply Co. v. Gamble-Skogmo, Inc.,* 348 F.2d 736, 744 (8th Cir.1965), *cert. denied,* 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966).

Among the factors to be considered in weighing the equities are the willfulness of the insider's violation, the type and degree of the insider's inadvertence, the position of the insider in the corporation, the length of time between the purchase and the repayment, and other circumstances of the case. Bad faith need not be shown. *See Whittaker v. Whittaker Corp.,* 639 F.2d at 533; *Champion Home Builders v. Jeffress,* 385 F.Supp. 245, 250 (E.D.Mich. 1974).

Normally, interest accrues from the time of transactions. But where delay has occurred for which the insider was not responsible, courts have accommodated the equities by awarding interest to run from the commencement of the suit. *See Champion Home Builders v. Jeffress,* 385 F.Supp. 245, 250 (E.D.Mich.1974); *Schur v. Salzman,* 365 F.Supp. 725, 734 (S.D.N.Y.

1973). In this case the district court awarded prejudgment interest on the profits recoverable from the date on which Orion filed its counterclaim for recovery under § 16(b). Based on the facts, we do not find the court abused its discretion in awarding prejudgment interest.

*Affirmed.* Costs to appellee.